### JOHN O'NEIL v. SUN COMPANY.

Decided December 8, 1909.

**1.—Contract—Oil Land—Title to Oil.**

That fact that oil in the earth is flowing or fugitive in its nature instead of stationary at the time a contract is made, will not prevent the owner of land from making a valid contract for the purpose of having the ground exploited and vesting in the party doing the work the title to such oil as may be extracted.

**2.—Same—Contract Construed.**

A lease contract for the purpose of prospecting for oil considered, and held to vest in the lessee the title to oil extracted by the lessor in violation of the rights of the lessee.

**3.—Same—Receivership—Expenses.**

Where, in an action by a lessee against his lessor to recover the title and right to an oil well and the product therefrom extracted by the lessor in violation of the lessee's rights under the contract, the lessee bases his right of recovery upon the contract, his recovery should be governed by the terms of the same, and he should be charged with such expenses as the contract imposed upon him. So, when the lessor was entitled under the contract to a certain part of the gross output of the well, the lessee's portion of the output should be charged with the expenses of producing the oil incurred by a receiver appointed upon the application of the lessee.

**4.—Appeal—Cross Assignments—Practice.**

A court of Civil Appeals will not consider cross assignments of error when there is nothing in the record to indicate that said assignments were filed in the trial court, no certificate of the clerk of said court that the brief containing said assignments was ever filed there, and no consent by appellant that such assignments might be filed originally in the Appellate Court. A general waiver of filing briefs in the trial court is not a waiver of the requirements as to filing cross assignments.

Appeal from the District Court of Harris County. Tried below before Hon. Norman G. Kittrell.

*Carlton & Townes* and *John Hamman,* for appellant.—The court

erred in overruling defendant's general exception to the plaintiff's second amended original petition. Authorities as to the meaning of the word "necessary for the operation of said well or wells": Perez v. San Antonio & A. P. Ry. Co., 28 Texas Civ. App., 255; McChesney v. Village of Hyde Park, 37 N. E., 858; Gallenkamp v. Garvin Machine Co., 86 N. Y. Supp., 378; Connors v. Chicago & N. W. Ry. Co., 82 N. W., 953; Ingle v. Bottoms, 66 N. E., 160.

"That oil in place is not subject to sale": State v. South Penn Oil Co., 24 S. E., 915; Kansas Natural Gas Co. v. Board of Commissioners, 89 Pac. 750; Kelly v. Keys, 62 Atl., 911; Watford Oil & Gas Co. v. Shipmen, 84 N. E., 53; Phillips v. Springfield Crude Oil Co., 92 Pac., 1119; Huggins v. Daley, 99 Fed., 606; Federal Oil Co. v. Western Oil Co., 112 Fed., 373; Federal Oil Co. v. Western Oil Co., 121 Fed., 674; National Oil & Pipe Line Co. v. Teel, 67 S. W., 545; Kelly v. Ohio Oil Co., 39 L. R. A., 765; Venture Oil Co. v. Fretts, 25 Atl., 732; Louisville Gas Co. v. Kentucky Heating Co., 111 S. W., 374.

The money that appellee had expended in drilling the two wells on the tract of land, that it claimed to have drilled, had no bearing on any issue involved in the litigation, and allegations touching this matter should have been stricken from the pleadings on exception. Guffey v. Hukill, 8 L. R. A., 759.

No proof being offered as to the amount of oil drawn from the land by the well in dispute, that might have been taken out by wells sunk by the appelee, there was nothing on which to predicate any recovery, and instructions to that effect should have been given to the jury. Louisville Gas Co. v. Kentucky Heating Co., 11 S. W., 374.

That simulated work on land held under an oil lease will not preserve any rights in the lessee, see J. M. Guffey Petroleum Co. v. Oliver, 79 S. W., 884; Parish Fork Oil Co. v. Bridgewater Gas Co., 59 L. R. A., 566; Swift v. Mining Co., 74 Pac., 700; Acme Oil Co. v. Williams, 74 Pac., 296.

That equity will relieve against the failure to develop by forfeiting the undeveloped part, see Coffinberry v. Sun Oil Co., 67 N. E., 1069; Acme Oil Co. v. Williams, 74 Pac., 296.

Where the facts so warrant, the lessor can treat an oil lease as being abandoned: Gadbury v. Ohio Oil Co., 67 N. E., 259; Maxwell v. Todd, 16 S. E., 926.

The lessor has a right to re-entry for conditions broken, and if the lessee fails to do necessary work, the lessor has the right to enter himself and do the work: Acme Oil Co. v. Williams, 74 Pac., 296; Donahue on Petroleum and Gas, 170.

That equity may decree the cancellation of the undrilled portion of leasehold premises, see Coffinberry v. Sun Oil Co., 67 N. E., 1069.

That forfeitures are favored where this will do equity, see Parish Fork Oil Co. v. Bridgewater Gas Co., 59 L. R. A., 566.

Even though the lease could be construed as fixing the number of wells that should be drilled, this would not relieve the lessee from the duty of protecting the land from drainage by outside wells. Guffey Co. v. Chaison Townsite Co., 48 Texas Civ. App., 555; Kleppner v. Lemon, 35 Atl., 109.

The coming in of the Donohoe well, after the making of the lease

to the Sun Company, so changed the conditions as to make it necessary for the Sun Company to protect the land from drainage, notwithstanding the fact that the lease might be construed as fixing, by inference, the number of wells to be drilled. Guffey Co. v. Chaison Townsite Co., 48 Texas Civ. App., 555.

The oil that Donohoe got out of his well belonged to him, even though it was drawn out of the acre in controversy; there could have, therefore, been no recovery against Donohoe, and consequently it was necessary to the rights of O'Neil that wells should be sunk on his land to offset the Donohoe well. Kelly v. Ohio Oil Co., 39 L. R. A., 765.

It is not committed exclusively to the lessee to determine what is reasonable diligence in developing an oil lease and protecting the lines. Brewster v. Brick Co., 140 Fed., 801.

It is the duty of the lessee, in an oil lease, to protect the lines of the land against drainage from outside territory. If the lessee fails in his duty, lessor has the right to sink wells where they should be sunk, and the lessees can not recover on account of any supposed injury done him thereby. Kleppner v. Lemon, 35 Atl., 109.

Even though the lessee had the right, on account of what it may have done, to hold exclusive possession of two-thirds of the acre of land, and even though it had the right to select the particular two-thirds that it would occupy, it could not exercise this right of selection arbitrarily and in such a way as to work an injury to the lessor. Jones v. Mount, 77 N. E., 1089; Pittinger v. Ramage, 82 N. E., 478.

Inasmuch as the first well begun under the lease never did become a producing oil well, the contingency whereby under the terms of the lease the lessee could begin the sinking of a second well and thereby acquire rights, never did happen or come into existence. It therefore follows that such work as was done on the well No. 5 only gave to the lessee a permissive right to occupy the space necesary to operate the well No. 5. This No. 5 well not having been sunk in accordance with the terms of the lease, or in compliance with any of the requirements therein contained, could not be held to give to the lessee a right to the occupancy of any particular portion of the land in controversy. Parish Fork Oil Co. v. Bridgewater Gas Co., 59 L. R. A., 566.

The lessee in an oil lease of the character in question does not become the owner of oil in place. Its right, at most, is the right to produce oil from the property. The measure of damages therefore for the taking of oil by lessor would have been the difference in the value of the oil that it got from the various wells that it had sunk and the value of the oil that it would have gotten had its operations not been interfered with by the well sunk by the lessor. Louisville Gas Co. v. Kentucky Heating Co., 111 S. W., 374; Duffield v. Hue, 20 Atl., 526; Duffield v. Rosenweig, 23 Atl., 4.

O'Neil's right to one-sixth of the proceeds of the oil that came from the well having been conceded, it was error to make this one-sixth bear any part of the expenses of the receivership.

*Greer & Minor,* for appellee.—If there was error in taxing any part of the costs against appellant's one-sixth royalty (which is the same

thing as taxing it against appellant as one of the litigants), this error was harmless for the following reasons: 1. Under the court's instructions, the jury allowed O'Neil $5,373.25 as the expense of drilling the disputed well, to which he was not entitled; whereas, the one-sixth of the receivership expenses taxed against O'Neil only amounted to $641.50, which would, in any event, leave a balance due appellee of $4,631.75. 2. The verdict of the jury, which found in favor of the defendant in the sum of $5,373.25 for the cost of drilling in and operating the disputed well, included within said amount at least $839 of profit, to which the defendant O'Neil was in no event entitled, and which was in excess of such *pro rata* part of the cost taxed against him, $641.50. Therefore error, if any, was harmless.

JAMES, Chief Justice.—The following contract was entered into between these parties:

"State of Texas, County of Harris.

"Memoranda of an agreement made and entered into this 23d day of February, 1907, by and between John O'Neil of Houston, Harris County, Texas; party of the first part, and the Sun Company, a corporation, of Beaumont, Texas, party of the second part, in which said first party represents that he has a good and sufficient title to a certain acre tract of land located in the Echols tract at Humble, Texas, as hereinafter described, and in which said second party is desirous of operating on same for the production of oil and gas or both, it being understood and agreed that said first party does hereby grant, sell and convey unto said second party all rights, title and interest in and to the oil and gas under the herein described premises with a right to enter upon the said land for the purpose of drilling for said oil and gas and water, and for the operating of said wells for the production of oil, gas and water in the manner hereinafter described, said tract of land being described as follows, and lying and being situated in Harris County, Texas, and being block No. 22 of the E. M. Isaacs subdivision of twenty acres out of the W. T. Payne tract in the John Brown Jones survey, and being near the town of Humble and near the waters of the west fork of the San Jacinto river, as shown by plat of the said subdivision made by A. E. Stinson, surveyor, and recorded in volume 1, page 74, of the Records of Maps and Plats for said Harris County, Texas, said block containing one acre of land and being a part of the twenty-five-acre tract bought by the said E. M. Isaacs from the said W. T. Payne.

"This agreement is made on the following conditions:

"First, Said second party hereby agrees to commence with the drilling of a well on said tract of land within ten days from this date, and to complete the same with due diligence to such depth as is commonly recognized as the oil producing depth in the vicinity of this tract of land, unavoidable accidents and delays excepted.

"Second. With the completion of said first well, if the same is a paying well, the second party agrees to commence the drilling of a second well on said acre of land within ten days after the completion and putting to pumping of said first well; and on the completion of

said second well, if the same is a paying well, said second party agrees to commence with the drilling of a third well within ten days after the completion and putting to pumping of said second well.

"Third. Second party agrees to place to the credit of first party the one-sixth part of the net amount of oil produced and saved from operations under this lease, said one-sixth amount of oil to be placed to first party's credit in the pipe line with which said second party may connect its tanks used for the production from this lease.

"Fourth. Second party shall have the right to use free of cost oil, gas and water from these premises for the purpose of carrying on the operations on these premises.

"Fifth. Second party shall have free pipe-line privileges either for itself or for the pipe-line company with which it may connect the production from this lease, both on and over the land herein leased, and also on and over the other land controlled by first party in this part of the Humble oil field.

"Sixth. At any time after the completion of the said first well on this lease, second party may release all or part of the tract · herein leased and thereafter be relieved from all obligations as to said tract or part of tract released; and should said second party release a portion of this tract, it shall be privileged to continue operations on the portion of the tract on which it may have drilled any well or wells, retaining such proportion of the tract as may be necessary for the operation of said well or wells already completed or drilling, the amount to be retained to be based on one-third of the whole tract herein leased for each well already drilled or drilling. Should second party thus release all or a portion of this tract, it shall be privileged to remove all of its material from said tract released.

"Seventh. In consideration of said second party's agreement to drill said first well and the obligation thereby undertaken by said second party, it is understood and agreed that the discharge of said obligation is sufficient to support each and every one of the options herein contained.

"Eighth. This lease or grant shall continue in force for the period of one year, subject to all the terms and conditions hereinabove named for cancellation prior to that date, and as long thereafter as oil or gas may be produced in paying quantities from this tract.

"Ninth. All the terms and conditions · of this grant or lease shall apply with equal force to the heirs and executors and assigns of both parties hereto.

"Signed and sealed this 23d day of February, 1907.
"(Signed) "John O'Neil,
"Party of the first part,
"Sun Company,
"By Edgar Pew,.
"Party of the second part."

Acknowledgments follow.

The acre of land was in the form of a square.

About February 28, 1907, under this contract the Sun Company began a well in the southeast corner. About March 15, 1907, and be-

fore the first one (which proved to be a dry well) was completed, it began a second well just south of the north line, about the middle thereof, completing the same about April 25th. The second one produced about sixty or seventy-five barrels per day, and this was a paying well though not a large producer.

After this lease was made, or about the same time, a well known as the Donohoe well was begun on the adjoining tract near the northeast corner of the acre in question, which proved to be a very large producer. Soon after this well came in, early in June, O'Neil began to drill the well in dispute (the one in the northeast corner of the acre, and near the Donohoe well), finishing it about July 6th or 7th. This produced 600 or 700 barrels per day, and continued to produce until some time in October, when it was abandoned (by the receiver hereinafter mentioned) having produced something over $13,000 worth of oil.

The Sun Company brought suit against O'Neil, claiming the title and right to the well and the product therefrom, and seeking a mandatory injunction for possession. The court turned it over to the receiver, by whom it was operated for several months until it quit producing. The proceeds of the sale of this oil after deducting all expenses, amounted to $9,554.35, which was invested in certain securities by consent of the litigants herein.

The case came to trial, and the court eliminated all issues except the reasonable cost incurred by O'Neil in sinking the well, and charged the jury that from five-sixths (the share of the Sun Oil Company) of the proceeds they should deduct the cost of putting down the well, and to give plaintiff a verdict for the balance.

The first assignment complains of the overruling of a general demurrer to plaintiff's amended petition, and in support of this assignment appellant advances these propositions:

1st. "The purposes for which appellee was permitted to keep a part of the land after it had once elected to abandon a part, being 'such proportion of the tract as may be necessary for the operation of said well or wells already completed or drilling,' there could have been no injury done it except by such an invasion on the part of O'Neil as would have interfered with the operation of the wells. It is not claimed in the petition that this was done, and consequently there is no cause of action."

2d. "The lease showed by its terms that the lessee, when once it had elected to abandon a part, could only keep the part necessary to enable it to properly operate its well, drilled or drilling, and the naming of the amount estimated to be sufficient for this purpose could not be enlarged by allegations into a grant of the oil supposed to underlie any part of the ground."

3d. "Oil is pumped from wells by the use of machinery, and so are wells drilled with machinery. To accommodate this machinery and the necessary appliances, a space of the surface must be used. Such being the conditions, the words 'necessary for the operation of said well or wells' by their own force apply themselves to this machinery, and can not be construed into an attempt to separate an estate in land and to grant oil in place."

4th. "A reservation in a contract is to be construed most strongly against the party for whose benefit it is being made; for instance, if a grantor in a lease makes a reservation for his benefit, it is to be construed most strongly against him; but if, on the other hand, the contract is so written that the lessee therein may be called on to give up part and hold part and the instrument gives the right of a reservation for his benefit, in this contingency this reservation must likewise be construed most strongly against such lessee."

5th. "Oil *in situ* is not such a mineral as is subject to sale. At least, an oil or mineral lease, such as we have here, does not have the effect of separating the estate and placing the title to the oil under the ground in the lessee. A lessee's right to it can only ripen into title after he has removed it from wells sunk by him and it has thus become a personal chattel."

6th. "The effect of plaintiff's petition was to assert ownership in the oil brought to the surface through the well sunk by O'Neil. Under no construction of the contract could it have had this right. The full extent of its injury, under any theory of the case, must have been the value of its part of the oil drawn from its part of the land through O'Neil's well, and which it would have otherwise gotten from the well sunk by it."

The fifth and sixth of the above propositions we dispose of at this point by overruling them. The contract in question is not to be viewed as a conveyance of the oil in the ground. The contract and its purpose was to confer upon the Sun Company the right to exploit the ground and acquire title to the oil by its extraction from the ground. The subject matter of this contract was the process and opportunity of extracting the oil, which, when produced, undoubtedly becomes property. This privilege or right in land is clearly the subject of contract, as much so as the right to mine for minerals. The fact that oil in the earth is flowing or fugitive in its nature, instead of stationary, can make no difference.

The other of the above propositions will be dealt with directly or indirectly by a discussion of the contract and construing it in its relation to the very facts of the case.

In the first place, the purpose of this contract was not the general development of the acre for oil production. The Sun Company entered into no such undertaking. It was expressly provided that only in the event of the first well being a paying well was the company obliged to sink a second well. If the first yielded oil in paying quantities, then within ten days thereafter, the company was to begin a second one, and if the second one proved a paying one, then within ten days it was to begin a third one. It was optional with the company whereabouts on the leased land it would sink those wells. The said provisions were inserted for the benefit of the company, and excluded any such idea as that it would be required to drill at places to be designated by O'Neil, or that it would in any event be required to bore more than three wells, or if any of the wells bored proved a failure, that it would be obligated to bore any further. There is nothing in the contract which can be construed to have the effect of imposing the duty upon the lessee to sink a well or wells at a particular place

or places, or to sink same with reference to what was advisable, or with reference to the lessor's wishes, or with reference to the protection of lines of this tract from depletion by contiguous wells.

The undisputed evidence shows that the Sun Company in due time began a well at the southeast corner of the tract, which resulted in a total failure, at great cost to the company. Under the plain terms of the contract no further obligation was imposed upon it to bore another well. There can be no doubt, however, that under this contract the company had the right to sink further wells, as many as it wanted to, upon the acre or any unreleased portion of the acre, during the term of one year. This is by force of its performance of the expressed consideration. Its right to thus exploit this land according to its own discretion became vested by the terms of the contract when the consideration was performed.

It is also an undisputed fact that in June during the contract year O'Neil sunk the successful well in question at the northeast corner of the tract.

Under the above facts and conditions, if a third person had done what O'Neil did, we think it clear the oil derived from such well would have rightfully belonged to the Sun Company, to be apportioned between it and O'Neil under the provisions of the contract, instead of its going to O'Neil exclusively; and as the contract was in force between these parties, we think the fact that O'Neil himself sunk the well would make no difference in this respect.

Appellant contends that O'Neil had, by release or acts of abandonment on the part of the Sun Company, acquired the right to sink this well. It is an established fact that on the completion of the second well the company released a third of the land to O'Neil, and the acts of the parties show conclusively that the land intended to be released was in the southwest corner of the tract. In fact, O'Neil then and there went into this corner and sunk a paying well on his own account. The company had the right to designate the third to be released, and, although nothing was expressly designated, the conduct of the parties establishes conclusively that the release applied to land in the southwest corner, which, in our opinion, excludes the idea by any possibility that land in the opposite corner of the tract was contemplated to be released. There was, therefore, no issue of fact to be submitted to the jury on this subject.

Another contention is that, when the Donohoe well came in, O'Neil insisted on the company following it up by sinking a well in the northeast corner, and that the facts raised an issue, which should have been submitted by the jury, as to whether or not the company announced its purpose to bore no further, which appellant claims would constitute an abandonment to him of all the land for the purpose of sinking wells thereon.

We have already seen that the Sun Company had performed the consideration for the contract, and that by reason of the failure of the first well it bored, it was under no obligation to further sink a well or wells, and had acquired a vested right in the land for oil production for the year, the right to sink wells on the land wherever and whenever during the year it saw fit, and that this right was exclusive, ex-

cept as to released parts of the land. Of course, we must admit that even under these circumstances it could have consented to O'Neil boring a well for himself. The testimony, however, was not sufficient to raise such an issue. Mr. Pew was the manager of the Sun Company. O'Neil testified that when the Donohoe well came in he asked McCullough (the company's superintendent of production) if he was going to drill there, and that he said he did not know; that he (O'Neil) told him "that he could go ahead and drill on the location in the northeast corner if they wished to, and that if they did not he would drill it himself." McCullough said that he would have to take it up with Mr. Pew. That some days after this he (O'Neil) went to Pew's office and talked with him about drilling the well in the northeast corner, and he made Pew two or three propositions, and that Pew told him he would consider the matter and let him know in a day or so; that he waited a while, and after inquiring from the employes of the Sun Company whether or not they had heard from Mr. Pew about the matter, and on being told they had not he ordered a derrick to be put up on the location.

O'Neil testified also that the first time he took up the subject of drilling on the northeast corner was with Mr. McCullough, on the day his (O'Neil's) well in the southwest corner came in; that he could not give the conversation word for word, but he told him that there was another good location in the northeast corner that should be drilled; that other people were taking the oil, and he told McCullough that he was willing for the Sun Company to drill it if they cared to, and if they did not he was going to do so himself.

When all the evidence on this subject is properly understood, it went no further than to indicate a disinclination on the part of Pew to bore further wells. There was no evidence that Pew- gave consent to O'Neil to proceed with the well in question; O'Neil admits that he got no such consent or intimation from Pew himself, and what would seem to indicate Pew's consent (statements made to O'Neil by the company's employes as to what they had understood from Pew) were in connection with the well that was drilled by O'Neil in the southwest corner. The Sun Company may not have desired to sink another well at that time, but nevertheless it did not part with its right to do so when it saw fit, and did nothing that would estop it from claiming the benefits secured by its contract. The company persistently protested to O'Neil against his drilling at that place.

Another form of release or abandonment of the premises contended for is that the release of one-third of the land upon the coming in of the second well, was *ipso facto* an abandonment of all the land for drilling purposes, as the reservation provided for in the contract in the event of a partial release was for such part as was necessary for the operation of the well or wells "then completed or drilling." The idea is that the reservation was confined to some purpose necessary to the operation of such wells as had been or were then being drilled, and therefore the only use of the unreleased land which the company was entitled to did not extend to drilling. The contract is not obscure as to it continuing to be in force for all purposes in reference to the un-

released portion, and the restricted use of land had reference to the land that was released.

The fact that well No. 4 (the first one drilled in the southeast corner, and which failed), was abandoned, did not operate in any manner as an abandonment of appellee's rights under the contract as we construe it. The fact, if it was a fact, that appellee continued to drill on this well until October, and this work was simulated in order to fortify its right to retain the land in the northeast corner where the well in question was situated, was immaterial, as its right in the northeast corner did not depend upon the continuation of work on the well in the southeast corner.

The views above expressed in this effect reach to and dispose of all of appellant's assignments of error, and lead to the conclusion which the trial court reached, viz., that the evidence established that the oil produced from the well in question was the property of the appellee and came within the scope and provisions of the contract between it and appellant, and that the proceeds were subject to be disposed of according to its terms.

Appellant assigns as error the action of the court in charging the receipts of the receivership with the expenses thereof, which contention means that all the expenses incurred by the receiver should have come out of appellee's share. Inasmuch as the theory upon which the recovery by plaintiff was allowed is that O'Neil did not occupy the position of a rank trespasser, which is indicated by the court having allowed him the cost of sinking the well, we think it would follow that the oil produced from the well should be governed by the terms of the contract, and stand for apportionment in accordance with it. O'Neil being interested in the contract and in the subject matter thereof, stood, in equity, in a more favorable attitude than a mere trespasser, and so the court treated him. The Sun Company founds its suit upon the contract, and ought to be willing to abide by it as to all parties thereto. When it recovers this oil or the proceeds thereof, it does so under the contract, and the terms of the contract should determine the respective rights of the parties to the proceeds. This being so, the assignment should be sustained, and in this regard the judgment will be modified.

There is nothing before us to indicate that the cross-assignments were filed in the District Court. There is no certificate of the district clerk either upon the briefs filed here or otherwise showing that appellee's brief which contains the cross-assignments was ever placed on file there. No consent appears for filing cross-assignments originally in this court. There is a general waiver by counsel of the filing of briefs in the District Court; but no waiver appears as to cross-assignments of error. We, therefore, think we have no right to consider these cross-assignments, especially as appellee's brief was not prepared at the time the cause was submitted and is just now filed by consent of parties given when the case was submitted, and the existence of these cross-assignments may not even now be known to appellants. We think it clear that the cross-assignments can not be considered as properly before us. The errors alleged in them are not such as may be

presented without assignments.  San Antonio & A. P. Ry. v. Gurley, 92 Texas, 232 and 233.  Modified and affirmed.

### ON MOTION FOR REHEARING.

In order to make our view better understood in one particular, we may explain that O'Neil's interest in the oil produced from this piece of ground was fixed by the contract as one-sixth of the oil produced, which meant that the expense of production was to be borne by the Sun Company and none of it by O'Neil.  If the well had been installed in the regular way, and the same oil had been produced by the Sun Company, instead of by a receiver, the expenses of production would have fallen on the Sun Company, and we see no reason why, because the same expense was incurred through the agency of a receiver, whom the Sun Company saw proper to apply for, for the purpose, it should escape from its contract obligation to discharge such expense.  The receiver was appointed by mutual agreement between plaintiff and defendant, without prejudice to the rights and contentions of either party, to take charge of and operate said oil well.  This is expressly alleged in the petition.

We do not question the power of the court to have a receiver's expenses allowed to him out of the property or funds in his hands.  Nor do we question the propriety of allowing a court certain discretion and latitude in equitably adjudging such expense against one party in favor of another, as between the litigants, in a proper state of facts.  But we think that, under the arrangement between these parties, the cost of production should, as a matter of contract, be borne by the Sun Company, and especially so where its suit and its prayer are predicated upon the contract.

The court, after a decision of the case on appeal, should not, and therefore it declines to, entertain cross-assignments of error, not properly before the court for consideration prior to its decision.  Both the motion of appellant and appellee for rehearing are overruled.

*Modified and affirmed.*

Writ of error refused.