**MARNETT OIL & GAS CO. v. MUNSEY et al.**
(No. 2379.)

(Court of Civil Appeals of Texas. Texarkana. May 23, 1921. On Motion for Rehearing, June 16, 1921. Rehearing Denied July 2, 1921.)

1. **Mines and minerals ⬉55(1)—Owner may convey indefeasible legal title to minerals separate and distinct from surface rights.**

Owner of land may convey an indefeasible legal title to the minerals under the soil separate and distinct from the surface rights.

2. **Mines and minerals ⬉48—Nature of minerals; "corporeal property"; "realty."**

Minerals, being tangible substances, may be treated in law as corporeal property, and,

until separated from the soil, are part of the realty within which they lie.

[Ed. Note.—For other definitions, see Words and Phrases, Realty.]

3. **Mines and minerals ⬉55(7) — Indefeasible legal title to minerals not lost by abandonment.**

The indefeasible legal title to minerals conveyed by owner reserving surface rights cannot be lost by abandonment alone so as to reinvest grantor with its original ownership, since the tenure in such case does not depend for its continued vitality upon any form of use or enjoyment of the rights granted any more than does the tenure by which the surface rights are held under similar grants.

4. **Mines and minerals ⬉55(3)—Contract held not to convey title to minerals, but merely the right to explore therefor.**

"Lease" whereby owner "sold and conveyed" the minerals in described land in consideration of a nominal cash payment and the agreement of grantee to sink a designated number of wells within a stipulated time, and whereby it was agreed that, in case the grantee "is unwilling to bore said wells, the said party of the first part shall have the right to bore same, provided there shall be preserved to each well then bored by said S. [grantee] a surrounding territory of not less than seven acres of land," *held* not to convey an indefeasible legal title to the minerals, but merely to give grantee the right to explore for the minerals and bring them to the surface.

5. **Mines and minerals ⬉55(1) — Grantee's agreement to sink designated number of wells within stipulated time a sufficient consideration for conveyance of minerals.**

Agreement by grantee to sink a designated number of wells within a stipulated time would have been a sufficient consideration for the conveyance of minerals.

6. **Mines and minerals ⬉55(3)—Character of instrument determined by examination of entire instrument in the light of circumstances surrounding the parties.**

The question of whether a contract conveyed the minerals or merely a right to explore for minerals is not necessarily determined from the language used by the parties to define the legal effect of the instrument, but is to be determined by an examination of the entire instrument in the light of the circumstances surrounding the contracting parties.

7. **Mines and minerals ⬉78(2)—Claim of forfeiture held grantor's only right on grantee's refusal to either drill well or pay rental.**

Contract whereby owner conveyed minerals in consideration for a nominal cash payment and grantee's agreement to pay a royalty as the oil is brought to the surface, and whereby it was provided that a well was to be drilled within 30 days or a payment of $50 a month made at grantee's option, *held* a unilateral contract, which the grantee might ignore without incurring any liability for damages; the grantor's only right in such case being to claim a forfeiture.

---

⬉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**8. Mines and minerals ⬤➡77—Lessees held not to be deprived of rights in absence of contract stipulation except by voluntary conveyance or permanent abandonment.**

Where oil lease entitled lessees to explore for oil and operate oil wells on payment of royalty to lessor, without authorizing lessor to claim a forfeiture by reason of nonuser for any period of time, the only way lessees could be divested was by a voluntary conveyance or a permanent abandonment of the leases.

**9. Mines and minerals ⬤➡77—Lessees held not to have abandoned lease entitling lessors to claim forfeiture for nonuser; "abandonment."**

Lessee's failure to operate wells during 2-year period after having drilled 21 wells on the land and after operating the wells apparently to the satisfaction of the parties for about 15 years was not an abandonment entitling lessors to claim a forfeiture by reason of nonuser, where they had been operating at a loss, were involved in financial difficulties, and where they did not remove machinery from the premises, since in such case it did not appear that they intended permanently to relinquish their rights; abandonment being the intentional relinquishment of a vested right.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Abandon —Abandonment.]

On Motion for Rehearing.

**10. Courts ⬤➡247(5) — Motion to certify not granted where writ of error will lie to invoke jurisdiction of Supreme Court.**

A motion to certify to Supreme Court will not be granted by the Court of Civil Appeals where a writ of error will lie to invoke the Supreme Court's jurisdiction.

Appeal from District Court, Navarro County; H. B. Daviss, Judge.

Suit by E. W. Munsey and others against the Marnett Oil & Gas Company. Judgment for plaintiffs, and defendant appeals. Affirmed in part, and reversed in part and remanded.

W. J. McKie and Richard Mays, both of Corsicana, for appellant.

Dexter Hamilton, of Dallas, and Callicutt & Johnson, of Corsicana, for appellees.

HODGES, J. This suit was originally filed by the appellees against the appellant in 1913. Its purpose was to cancel two oil contracts and to recover damages for the failure of the appellant to operate certain oil wells on the leased premises for two years or more. By amendment the plaintiffs asked for the value of oil taken from the wells by the appellant since some time in 1914. In 1898 the owners of what is called in the record the Robbins and the Polk tracts of land, situated in Navarro county, by written contracts leased them to the parties under whom the appellant now claims. In due course of trade the appellees acquired the titles of Robbins and Polk, the lessors, and the appellant acquired all the rights of the lessees. The conditions requiring the sinking of wells within the time stipulated were complied with, and about 21 producing wells were sunk on the premises between the time the leases took effect and 1911. In the fall of 1911 Staley and the appellant, who had acquired the rights of the other lessees, ceased to operate the wells, but did not remove their machinery from the premises. This suit followed at the time mentioned, and the cancellation of the contracts was sought upon the ground that they had been abandoned by the lessees. A trial before a jury resulted in favor of the defendants below. On appeal to the Court of Civil Appeals of the Fifth District that judgment was reversed, mainly because of an erroneous charge. See Munsey v. Marnett Oil & Gas Co., 199 S. W. 687. In a second trial the plaintiffs, appellees here, recovered a judgment canceling the lease contracts and for the damages claimed. The cancellation was based upon a finding by the jury that the lessee had abandoned the contracts and all the rights originally conveyed. This appeal is from that judgment.

The first proposition urged is that the lease contracts were in effect conveyances of the legal title to the minerals in the soil, and that the grantees thereby acquired an interest which could not be lost by mere abandonment. The second is that the evidence is insufficient to sustain the finding of the jury that the lessees had abandoned their contracts. There are numerous other rulings complained of by the appellant which we think is unnecessary to discuss. Taking those questions in the order above stated, it becomes necessary to consider the terms of the contracts with a view of ascertaining the extent and character of the interests which the grantors intended to convey. Since those instruments were made by different grantors, are couched in different language, and relate to different tracts of land, they must be separately considered.

The material portions of the Robbins lease is as follows:

"That I, Mary B. Robbins, of Kingston, Mass., the party of the first part, in consideration of the sum of $5.00 paid by W. H. Staley, of Pennsylvania, party of the second part, the receipt of which is hereby acknowledged, and the further consideration hereinafter mentioned, have granted, bargained, sold, and conveyed, and do by these presents grant, bargain, sell, and convey, unto the said parties of the second part, their heirs, assigns, all of the oil, gas, and coal and other minerals in and under the following described land, together with the rights of ingress and egress at all times for the purpose of drilling, mining, and operating for minerals, and to conduct all operations and

lay all pipe necessary for the production, mining, and transportation of the oil, gas, water, or other minerals, reserving, however, to the party of the first part the equal one-eighth of all oil produced and saved upon said premises, to be delivered in the pipe line to the credit of the party of the first part free of charge. If coal is found, the parties of the second part agree to pay the first party four cents per ton for every ton of the same that is mined and marketed, payable monthly. If gas or other minerals are found, second party agrees to —— first party one-tenth of the net produce each year, payable monthly for the product of each well, while the same is being used off the premises. Said land being of the following description to wit: [Here follows description.] To have and to hold the above-described premises unto the said parties of the second part, their heirs and assigns, upon the following conditions: In case operation for either the drilling of a well for oil, mining, or other minerals is not begun and prosecuted with due diligence within thirty days from this date, then this grant shall immediately become null and void as to both parties.

"In case the parties of the second part should bore or discover either water, oil, or other minerals within the time above prescribed, then and in that event this lease, incumbrance, or conveyance shall be in full force for twenty years from the time of the discovery of said product, or as long as oil can be produced in paying quantities.

"Whenever sales are being made of the product produced on the land above described, a settlement therefor shall be made at the end of each quarter.

"This lease is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purposes herein mentioned, and it is so understood by both parties to this contract.

"It is understood between the parties of this agreement that all conditions between the parties hereto shall extend to their heirs, executors, administrators, and assigns.

"And the said Staley hereby agrees to bore not less than six wells within one year from the making of this lease, provided paying wells can be found on said tract, and will also bore six wells during the next year thereafter should paying wells justify such expenditures.

"It is further agreed that, in case the said Staley is unwilling to bore said wells, the said party of the first part shall have the right to bore same, provided there shall be preserved to each well then bored by said Staley a surrounding territory of not less than seven acres of land."

[1-5] That the owner of land may, if he sees proper, convey an indefeasible legal title to the minerals under the soil separate and distinct from the surface rights, is now well settled. Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989. Minerals, being tangible substances, may be treated in law as corporeal property, and, until separated from the soil, are part of the realty within which they lie. It is also true that, when minerals are conveyed in that manner, the title cannot be lost by abandonment alone so as to reinvest the grantor with his original ownership. The tenure in such cases does not depend for its continued vitality upon any form of use or enjoyment of the rights granted, any more than does the tenure by which the surface rights are held under similar grants. The granting clause of this contract undoubtedly uses language indicative of an intent to sell and convey the minerals as they exist under the surface; and, apparently to make that purpose still clearer, the following language is used:

"This lease is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purposes herein mentioned, and it is so understood by both parties to this contract."

While the cash consideration mentioned in the contract is only nominal, there is a clause which binds the grantee to sink a designated number of wells within a stipulated time. That obligation would seem to furnish a sufficient consideration for a sale and purchase of the minerals mentioned. If the conveyance ended with this, there might be little difficulty in sustaining the contention of the appellant that this instrument invested the grantees with the legal title to the corpus of the minerals as they existed under the soil, with a mere covenant on the part of the grantees to explore for and bring those minerals to the surface. But it is further stipulated:

"That, in case, the said Staley is unwilling to bore said wells, the said party of the first part shall have the right to bore same, provided there shall be preserved to each well then bored by said Staley a surrounding territory of not less than seven acres of land."

This language is inconsistent with any intent to make the untouched minerals the property of the grantees. It is an express reservation of a right in the owner to explore for and remove these minerals in the event the grantee fails. Considering the contract in its entirety, and the manifest purpose of the grantor in making it, the conclusion seems irresistible that it was intended, not as a conveyance of the minerals as they lay in the soil, but only the right to explore for and bring them to the surface where they could be utilized for profit. It should not be considered a conveyance of the corporeal property itself in its virgin state, but the grant of an incorporeal right to search for and when found put that property into a marketable condition. The owner expressly retained the fee in all the minerals that were not moved. The grantee took only a portion of that which he did remove.

[6] The language of the parties in undertaking to define the legal effect of this instrument is not necessarily conclusive. In the clause which precedes that definition the

instrument is referred to as a "lease," "incumbrance." Its real character and the nature of the legal rights created are to be determined by an examination of the entire instrument in the light of the circumstances surrounding the contracting parties.

On the former appeal of this case Associate Justice Rasberry held in effect that both of the contracts relied on conveyed rights that might be lost by abandonment. We have been referred to the case of Texas Co. v. Daugherty, supra, as holding to the contrary. In that case Chief Justice Phillips emphasized the fact that the consideration of $100 paid expressed in the contract was sufficient to support a present conveyance of the legal title to the minerals under the soil. There was no stipulation which reserved to the owners the right to take the oil in the event the grantee failed to do so. The contract there under consideration was, we think, clearly distinguishable from this.

The second contract under which the appellant holds is as follows:

"That W. A. Polk and M. J. Polk, of Navarro county, Tex., of the first part, in consideration of the sum of one dollar to said first party paid by T. J. Carmody and F. P. Davis, the parties of the second part, the receipt of which is hereby acknowledged, and the further consideration hereinafter mentioned, have granted, bargained, sold, and conveyed, and do by these presents grant, sell, bargain, and convey, unto the said party of the second part, their successors and assigns, all oil, gas, and coal or other minerals in and under the following described land, together with the right of ingress and egress at all times for the purpose of drilling and operating for oil, gas, water, coal, and other minerals, and to conduct all operations and lay all their pipes necessary for the production and transportation of oil, gas, water, or other minerals, and to erect all buildings and machinery necessary to the conduct of their business thereon, reserving however to the first party the one-eighth part of the oil, coal, and other minerals produced and saved from said premises, to be delivered in second party's pipe line to the credit of first party, free of charges, said land being of the following description, to wit: [Here follows description.]

"To have and to hold the above-described premises unto the parties of the second part, their successors and assigns and legal representatives on the following conditions:

"(1) If oil, gas, coal, or other minerals are found second party agrees to pay one-eighth part to first party while the same is being used off the premises.

"(2) Wherever first party shall request it, second parties shall bury all oil or gas lines and pay damage done to growing crops by reason of burying and removing said lines.

"(3) No well shall be drilled nearer than 100 feet to the house or barn on said premises.

"(4) This lease shall become null and void at the end of thirty days from date unless second parties have completed boring the first well before that date, provided, however, that this lease may be kept in force by payment by said second parties until the above-mentioned well is completed by second parties.

"(5) The second parties shall have the right to use sufficient gas, oil, and water to run all necessary machinery on this lease and adjoining leases owned by them, and also the right to remove all their property at any time, including all piping, casing, tubing, jack rods, and other well appliances used in connection and the development herein contemplated.

"(6) It is understood between the parties to this agreement that all conditions between the parties hereto shall extend to their heirs, executors, and assigns."

[7] While in some respects this is similar to the first, it is essentially different in other important details. It recites a cash consideration of $1 "and the further consideration hereinafter mentioned," but none of any value is mentioned except an obligation to pay over a royalty as the oil is brought to the surface. This is obviously a unilateral contract—one which the grantees might ignore without incurring any liabilities for damages. If we test their rights by what they might have claimed immediately after the contract was executed and delivered, the grantees acquired no enforceable legal title to anything. If they did, it was without any consideration whatever. It is true the contract stipulated that, unless a well was drilled within 30 days, the contract was to become void; but that was a condition subsequent, which could operate only to divest a title which had previously become vested. The grantees had the option of evading that forfeiture by merely paying the sum of $50 per month. They were not obligated to bore the well or to pay the $50. If they refused to do either, the grantor could have done no more than claim the forfeiture. National Oil & Pipe Line Co. v. Teel, 95 Tex. 586, 68 S. W. 979; O'Neil v. Sun Co., 58 Tex. Civ. App. 167, 123 S. W. 172; Texas Co. v. Daugherty, 107 Tex. 240, 176 S. W. 717, L. R. A. 1917F, 989. The contract in the Teel Case is in all legal respects the same as that before us. Chief Justice Phillips, in the Daugherty Case, thus refers to it:

"The contract was supported by only a nominal consideration, other than a mere promise of the lessee to perform certain acts, but for the performance of which he was not bound. The contract was construed properly as the creation of a mere option which permitted the acquisition of an interest on performance of conditions—a mere optional right to acquire an interest in land, a character of instrument plainly distinguishable from those here presented."

See, also, 1 Thornton's Law of Oil and Gas, §§ 56 and 57.

It is inconceivable that the owners intended to part with their title to valuable mineral rights for the nominal consideration of $1, without any obligation on the part of the purchaser to develope the territory for the purpose of securing the royalty to which they

must look for the real remuneration. The contract, we think, falls clearly within the class discussed by Associate Justice Greenwood in Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464. It was there held, in effect, that such a grant conferred only an incorporeal right, which might be lost by abandonment.

But the further question remains: Was the evidence in this case sufficient to sustain a finding that the lessees had in fact abandoned their contracts? The facts show that approximately 21 wells had been drilled on the property prior to the time the appellees acquired their interests. It is also shown that numerous other wells controlled by the appellants had been drilled on territory surrounding those lands. The wells on the property of the appellees had been operated apparently to the satisfaction of the parties interested about 15 years and until the fall of 1911. In July, 1912, the original owners conveyed their interest to A. G. Elliott. For a few months Elliott and the appellees Munsey owned the property jointly. In January, 1913, Elliott sold his interest to the appellees. In the fall of 1911 while the leases were still owned by Staley and the appellant, the operation ceased, and was not resumed till in the spring of 1914, a period of approximately 2 years and 6 months. B. B. Polk, one of the heirs who inherited title to what is known as the Polk tract, testified that operations ceased before he sold his interest to Elliott, and that he protested to Staley, who was in charge of the wells, against the cessation of work. Staley told Polk that he was going to resume work after changing the system of drawing oil from the wells. Previous to that time the wells had been operated with air pressure, but Staley said he was going to put in pumps. Elliott testified that after he acquired an interest in the property he had several conversations with Staley regarding the resumption of operations. The substance was that he demanded that Staley either resumed operations or removed his equipment piping from the land. He talked with Staley a number of times, and Staley always said that they had machinery coming and were going to again operate the wells. The machinery to which Staley referred was to go into the pump station. In his talks with Staley the latter would always begin by saying, "My boy, I am going to operate the wells. I have got the machinery coming, and you boys just wait." Appellee B. B. Munsey testified that when he and his brother purchased the land there was a mass of old dilapidated pipes and oil wells on it. There was no pump station on the property. None of the wells were then being operated. The connections were torn up and scattered around, and weeds had grown up around the wells. No one was paying any attention to them. There was no sign of oil production around the wells.

They remained in that condition until June, 1914, when operations were resumed. This was after he had filed a suit for the purpose of canceling the leases. He went to Staley on several occasions after purchasing the property, and asked him to remove the scattered pipe and materials off the land or to rehabilitate and fix up the leases and begin operation. Staley always told him that they intended to begin operations again; that they were waiting to get machinery which had been shipped for the purpose of replacing some of the equipment. According to other testimony Staley owned an undivided one-fourth interest and the appellant a three-fourths interest in the leases. In January, 1913, Staley was put into bankruptcy, and Polk, as trustee, took charge of the entire interests of both appellant and Staley in the oil property. Polk was in actual control of the property for about a year before the bankrupt's estate was finally wound up and Staley's interest sold. He was at the time acting under the orders of the United States bankrupt court. The subject of rehabilitating the property and starting the pumps was discussed between Polk and the appellant. This required money, which neither was willing to furnish. In the spring of 1913 a field manager of appellant was there while Polk had possession, and inspected the property for the purpose of estimating the cost of improving it. It was ascertained that it would require approximately $10,000 to rehabilitate and put it in proper shape. Acting under the instructions of his attorney, Polk refused the request of the appellant for the possession and control of its interest in the property. He understood from his attorney that the appellant wanted it in order to rehabilitate the well. During those negotiations his attorney proposed that, if the appellant would furnish three-fourths of the cost, the trustee would furnish the remaining one-fourth, and in this way they would rehabilitate the property; but that offer was not agreed to. During his control Polk buried some piping on the land at the request of the owners. This was done in response to the complaint that the piping was interfering with the cultivation of the land. Staley never told Polk that the wells were dry, and that they intended to abandon them. Some time later the United States Circuit Court of Appeals, in reversing the judgment of the bankrupt court, held that the trustee had no right to take charge of the property, and directed him to return to the appellant the control and possession of three-fourths interest in it. Under the orders of the bankrupt court Staley's interest was later sold, and purchased by the appellant. The substance of this testimony was repeated by other witnesses. There was other evidence tending to show that when the work ceased the price of oil had declined so that operations were con-

ducted at a loss. When the appellant resumed work in 1914, the price had increased to where a profit could be realized.

[8, 9] The contracts discussed contained no provisions authorizing the lessors to claim a forfeiture by reason of nonuser for any period of time. So far as this controversy is concerned, the rights of the lessees were held unconditionally. The only way they could be divested was by a voluntary conveyance or a permanent abandonment of the contracts. Abandonment is the intentional relinquishment of a vested right. 1 Thornton Law of Oil & Gas, § 155; 2 Washburn, Real Property (3d Ed.) pp. 340, 341; 1 R. C. L. p. 1. The distinction between the intentional relinquishment of a legal right and the loss of that right by a forfeiture must be kept in mind. Abandonment is purely a matter of intention. Time is of no importance as an element to be considered except as indicative of intention. Forfeiture is the involuntary loss of a right or contract of conveyance. The failure, during a long period of time, to assert or exercise the incorporeal rights such as are conveyed in contracts of this character, may furnish strong evidence that the grantee had intentionally abandoned or relinquished his rights. But such inactivity does not, under the terms of those contracts, create a forfeiture. While the duty of continuous operation of the wells may be implied, it is not a condition subsequent which may form the basis of a forfeiture. Grubbs v. McAfee, 109 Tex. 527, 212 S. W. 464. The jury must have found in this case that Staley and the appellant had intentionally relinquished their rights as lessees to any further interest in the territory covered by their contract. The principal evidence relied on to sustain that finding is the cessation of work during the period of approximately two and a half years. As opposed to the inference to be drawn from that circumstance, we have the repeated declarations of Staley, the manager in charge during that time, that the lessees had closed down only temporarily and for the purpose of making some needed repairs; that they had intended to resume operations as soon as practicable. It was shown that the machinery had been used many years and doubtless needed repairing. The lessees were operating at a loss; and one of them, Staley, was involved in serious financial difficulties. The evidence shows that he became insolvent and was thrown into bankruptcy, entailing litigation which resulted in practical interference with the operations of the wells for a period of approximately one year. During all that time valuable machinery belonging to the lessees remained on the premises. Nothing was removed. The property was also inspected by an expert acting under the direction of the

appellant, with a view of rehabilitation and resumption of work. As evidence of abandonment counsel for the appellees refer to the fact that the price of oil had declined to a point where the wells could no longer be operated except at a loss. That situation might with equal propriety be regarded as an inducement to make the cessation temporary only, and not permanent. It is a matter of common knowledge that the price of oil fluctuates. A period of depression might easily be selected as a time within which to make needed repairs, and that period might be prolonged by financial difficulties. We have concluded that the evidence was insufficient to sustain the finding by the jury that there had been an intentional abandonment of the contracts by the lessees. Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396; Fisher v. Crescent Oil Co., 178 S. W. 908; Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464. It follows that the judgment canceling the contracts and awarding damages for the value of all the oil taken from the wells since the resumption of operation in 1914 is erroneous. The appellees are entitled to recover damages resulting from the failure to operate the wells during the period of inactivity claimed. There is nothing in the record to indicate any error in that portion of the judgment, and it will remain undisturbed.

For the errors pointed out, the remainder of the judgment will be reversed, and the cause remanded, in order that the parties may litigate their rights to the oil taken from the wells since the resumption of work in 1914.

### On Motion for Rehearing.

An examination of the appellees' amended original petition, on which the case was tried, discloses the fact that the plaintiffs did not ask a judgment for the royalty which accrued after the appellant resumed the operation of the wells in 1914. There is, then, no occasion for a remand of this case for the determination of that question. The motion of the appellant will be granted, and the judgment of this court will be reformed and affirmed in part as indicated in the original opinion. The judgment canceling the lease contracts will be reversed, and judgment here rendered in favor of the appellant upon that issue. This judgment, however, is without prejudice to the right of the appellees to hereafter sue for and recover the royalty due them since the resumption of operations in 1914.

[10] The motion of the appellees for a rehearing will be overruled. Their motion to certify will be also overruled, for the reason that a writ of error will lie in this case should they desire to invoke the jurisdiction of the Supreme Court.