BURNHAM et al. v. HARDY OIL CO. et al.†

(Court of Civil Appeals of Texas. San Antonio. April 10, 1912. On Motion for Rehearing, May 8, 1912.)

1. HUSBAND AND WIFE (§ 274*)—COMMUNITY PROPERTY—INTEREST OF HEIR—EXTINGUISHMENT.

A conveyance, made by one after the death of his wife to an heir of the community property, of property which belonged to him separately, and made without reference to the community estate, did not extinguish the heir's interest; the rule that a conveyance by the survivor of the community to an heir of property approximating in value the interest of the heir, and made and accepted in settlement of the heir's interest, will extinguish the heir's claim in the remaining property, having no application.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1026–1031; Dec. Dig. § 274.*]

2. HUSBAND AND WIFE (§ 274*)—COMMUNITY PROPERTY—ACTION BY HEIRS—DEFENSES—LACHES.

Where in 1866 the surviving husband conveyed land constituting community property, and it passed by various conveyances to defendants, an action by heirs of the deceased wife in 1908, based upon the title which descended to them under the statute, was not barred under the doctrine of stale demand.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1026–1031; Dec. Dig. § 247.*]

3. HUSBAND AND WIFE (§ 267*)—BONA FIDE PURCHASER—COMMUNITY ESTATE.

Where one acquired title under the statute upon the death of her mother to an interest in the community property, purchasers of such interest from her father acquired no rights as innocent purchasers.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 929–952; Dec. Dig. § 267.*]

4. ADVERSE POSSESSION (§ 71*)—COLOR OF TITLE—COMMUNITY ESTATE.

Nor did such purchasers have title or color of title so as to enable them to claim by the three-year statute of limitations.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 415–429; Dec. Dig. § 71.*]

5. ADVERSE POSSESSION (§ 14*) — TITLE BY PRESCRIPTION—OCCUPANCY.

The five-year statute of limitations was ineffective to establish any title by prescription under a recorded deed while the land remained unoccupied.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 77–81; Dec. Dig. § 14.*]

6. ADVERSE POSSESSION (§ 71*)—TITLE—SUFFICIENCY.

Where the grantee under a recorded deed merely held title for the benefit of a company which was the real owner, the company could prescribe by the five-year statute of limitation the same as if the deed stood in its own name.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 415–429; Dec. Dig. § 71.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error granted by Supreme Court June 26, 1912.

7. ADVERSE POSSESSION (§ 36*)—EXCLUSIVE POSSESSION.

Where a company inclosed with a fence and controlled and used a large body of land including the tract in controversy, the fact that within this inclosure there were tracts controlled and used by others did not prevent the five-year statute of limitations from running in favor of the company as to the tract in controversy

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 139–143; Dec. Dig. § 36.*]

8. INFANTS (§ 24*)—MINOR.

In order for a claim of adverse possession to prevail against one who was a minor at the commencement of the possession, the adverse possession must continue for the requisite period after the minor becomes of age.

[Ed. Note.—For other cases, see Infants, Cent. Dig. § 25; Dec. Dig. § 24.*]

9. TRIAL (§ 194*)—INSTRUCTIONS—EVIDENCE.

In an action involving the title to land, it was error to instruct that the defendants had acquired title by five-year limitations as against certain plaintiffs, where the evidence as to the adverse possession of defendants after the plaintiffs became of age was not conclusive, though sufficient to have sustained a verdict for the defendants.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 439–441, 446–454, 456–466; Dec. Dig. § 194.*]

10. TENANCY IN COMMON (§ 22*) — OIL — RIGHTS OF COTENANTS.

One having an undivided interest in land could extract oil therefrom without his cotenants concurring or participating.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 63; Dec. Dig. § 22.*]

11. TENANCY IN COMMON (§ 32*)—OIL—ACCOUNTING BETWEEN COTENANTS.

Where a company which has found and marketed oil from land in which it has an undivided interest is required to account to a cotenant for his interest in the oil, measured by his interest in the land, such cotenant is chargeable with all reasonable expenses incurred in producing and marketing the oil, including the reasonable cost of a necessary pumping plant and pipe line.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 97; Dec. Dig. § 32.*]

12. APPEAL AND ERROR (§ 1173*)—DECISION —PARTIES.

Where a judgment for all of the defendants, upon the ground that part of them had acquired title by adverse possession, was reversed as to such defendants, it was necessary also to reverse the judgment as to those who claimed as lessees and occupants of parts of the land and defended against the plaintiffs' claim of title.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4562–4572; Dec. Dig. § 1173.*]

13. TENANCY IN COMMON (§ 32*)—OIL—ACCOUNTING BETWEEN COTENANTS.

No part of the expenses of nonproducing oil wells sunk by one having an undivided interest in land is chargeable against a nonparticipating cotenant on an accounting sought by the cotenant for a part of the oil produced.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 97; Dec. Dig. § 32.*]

On Motion for Rehearing.

14. TENANCY IN COMMON (§ 43*)—PARTIES BUYING OIL—LIABILITY TO COTENANTS.

Purchasers of oil from one who, without the concurrence of his cotenants, has extracted it from land in which he has only an undivided interest, are liable to the cotenants if the transactions are a wasteful disposition of the oil, though purchasers of oil are not ordinarily liable to cotenants with whom they did not deal.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 130–132, 136, 137; Dec. Dig. § 43.*]

15. TENANCY IN COMMON (§ 55*)—ACCOUNTING BETWEEN COTENANTS—PARTIES BUYING OIL—WASTE—QUESTION OF FACT.

Where it appeared that a purchaser of oil had paid for the same at about half its value, the payment being made by furnishing a pumping station and pipe line, it was a question of fact whether or not the transaction was an act of waste so as to hold the purchaser liable to complainant, a cotenant, and to what extent.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 140–156; Dec. Dig. § 55.*]

Appeal from District Court, Matagorda County; C. F. Carsner, Special Judge.

Action by James H. Burnham and others against the Hardy Oil Company and others. From a judgment for defendants, plaintiffs appeal. Affirmed in part; reversed and remanded in part.

See, also, 124 S. W. 221.

Baldwin & Taylor and L. C. Christian, all of Houston, Linn, Conger & Austin, of Bay City, and Delvin & Delvin, of Sacramento, Cal., for appellants. Gill & Jones, of Houston, Gaines & Corbett, of Bay City, R. A. John, of Houston, W. W. King, of San Antonio, G. G. Kelley, of Wharton, A. L. Beaty, of Sherman, and Baker, Botts, Parker & Garwood, of Houston, for appellees.

JAMES, C. J. This is an appeal from a judgment based upon a verdict instructed for appellees, upon the ground that they had acquired title by five years' limitations to the interest sued for by appellants in the Henry Parker league. The amended petition was filed by James H. Burnham, Frederick Parker Burnham, Kate E. Burnham, sole devisee of Charles E. Burnham, Herbert O. Farjeon, Emma Irene Legge and husband, Robt. T. Legge, against the Hardy Oil Company, the Texas Land & Cattle Company, the Northwestern Irrigation Company, the Rio Bravo Oil Company, the Clem Oil Company, the Producers' Oil Company, the Square Deal Oil Company, the Pay Streak Oil Company, all corporations, and a large number of individuals, claiming title to an undivided one-fourth of said league (except a certain 40-acre tract), and basing claim for damages on rents for two years, and upon the value of oil extracted from the land, and asking for partition and general relief. The petition set up claim for their title and the heirship of plaintiff under the wife of Henry Parker,

*For other cases see same-topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

alleging the league to have been community property of Henry Parker and wife; that the chief value of the land consists of the oil therein; that since the discovery of oil there defendants have gone into possession and since June 1, 1908, have been and are extracting, holding, and disposing of large quantities of the oil; that the Hardy Oil Company had sold and contracted to sell large quantities thereof to the Rio Bravo Oil Company, etc., and has been and is guilty of waste, etc., and prayed for injunction and receiver, etc. A receiver was appointed, but on an appeal the Court of Civil Appeals at Galveston set aside the order. Hardy Oil Co. v. Burnham, 124 S. W. 221. It is impracticable, in this opinion, to set forth the pleadings of defendants, on account of their number and length, and it is unnecessary to do so. These, so far as material, can be stated in the course of the opinion.

[1] Although the judgment rests upon the trial judge's view that defendants had established their plea of five years' limitations, appellee is contending further that the verdict was correct also upon another ground, which we notice first. It is embodied in the following proposition: "It appearing from recitals in the will of Henry Parker and conveyances from him that the heirs of his deceased wife have received from his estate property equal in value to their interest in their mother's estate, they are not entitled to recover against a purchaser of community property from and under Henry Parker, the surviving husband, after the lapse of 50 years, in the absence of evidence that they have not received their distributive share of the community."

The facts to be considered, in connection with the above proposition, are these: The grant to Henry Parker in 1833 sufficiently showed upon its face to have been community property of himself and wife, Henrietta, under whom plaintiffs claim. His wife died in 1835. Henry Parker was a man of considerable means and died in 1869 leaving no debts, and there was no partition of community property between himself and their children, of whom there were three, Frederick A. Parker, who died in 1867, unmarried and without issue; Wm. E. Parker, still living but not suing; Emily L. Parker, who married James G. Burnham in 1844 and died in 1859. James G. Burnham died in 1878. They had children as follows: James Henry Burnham, born November 1, 1845; Henrietta Burnham, born April 8, 1848, married S. Farjeon in 1872, and died July 14, 1883. Farjeon died in 1897. They had two children, Emma Irene Farjeon (who married Robt. T. Legge November 25, 1908) born August 27, 1874, and Herbert O., born October 27, 1880. Mary Emma Burnham and Lucy Burnham died in childhood, one in 1856 and the other in 1854. Charles Edward Burnham, who married Kate E. Rawson, died April 28, 1889, leaving one child, Muriel

Burnham. By his will he left his estate to his wife, who is a party plaintiff; Fred P. Burnham, who was born on December 9, 1858.

From the above it will be seen that the plaintiffs represent the interest of Emily L. Parker, a daughter of Henry and Henrietta Parker. It appears that on January 16, 1866, Henry Parker conveyed to his son, Wm. E. Parker, this league of land, reciting in the deed a consideration of $500; also, that Henry Parker left a will, dated June 7, 1858, and probated in 1869, giving and devising this league and all other property to his son, Wm. E. Parker, with this accompanying recitation: "To my son, Frederick A. Parker, and my daughter, Emily L. Burnham, I have already given them all I think them entitled to of my estate, and I now leave them their father's blessing." It appears that Wm. E. Parker improved and lived upon this league from about 1875 to the summer of 1879, and on July 1, 1879, sold and conveyed the league to Joe and A. Vanham. On November 24, 1884, the Vanhams conveyed it to August Kountze, who, on June 21, 1890, conveyed it to the Texas Land & Cattle Co., a defendant herein. As corroboration of the recital in Henry Parker's will that he had given to his daughter, Emily Burnham, all he thought she was entitled to of his estate, defendants introduced deeds from him to Emily Burnham, one dated March 23, 1874, for 714 acres in Jackson county, which was the separate property of Parker, and the other dated May 1, 1852, for four lots in Corpus Christi (the lots appear to have been without good title), together with testimony tending to show that the Jackson county land was then worth about as much as this league. Also a deed from Emily Burnham dated March 11, 1880, whereby she sold and conveyed the said Jackson company land for $900.

Upon the foregoing facts it is insisted by appellee that the verdict was correctly directed for defendants, regardless of the issue of limitations, the argument being that the recitals in the will, together with said proof, evidence an advancement by the survivor of the community, which Mrs. Burnham accepted, and which, in view of nonclaim on the part of Mrs. Burnham and her heirs for so long a time, operated as a settlement with Mrs. Burnham and a discharge of her community interest in the league in favor of the surviving husband's disposition of it.

That a settlement or satisfaction of an heir's interest in a community estate may be had and consummated between a surviving husband and an heir of the wife, by means merely of conveyances of such property from the survivor to the heir, we have no doubt. Where it is shown that the survivor of the community conveys part of the community estate to an heir, approximating in value the interest of such heir in the community estate, or where such a conveyance is made and is

shown to have been accepted as a settlement of the heir's interest, ought to be looked upon as an extinguishment of the heir's claim in the remaining property. But here we have facts which deny such a result. In the first place, the property which Parker conveyed to Mrs. Burnham was not community property. In the second place, Mrs. Burnham was a married woman, and this, together with the fact that the deed to her was of Parker's separate property and the transaction involved no reference whatever to the community estate, brings the matter squarely within the decision in Stevens v. Shaw, 68 Tex. 262, 4 S. W. 458.

[2-4] Descent was cast by statute on the daughter, Mrs. Burnham, at her mother's death. We agree with the conclusions expressed by the Court of Civil Appeals in this case in 124 S. W. 221, as follows: That the title which so descended did not become stale, and that there can be no question of innocent purchaser under Henry Parker, as to their title. In fact, these contentions appear to have been abandoned. Also, that the nature of the title so cast upon Mrs. Burnham was such as would prevent those holding under Henry Parker having title or color of title so as to enable them to claim by the three years' statute of limitations. We also concur in the opinion that the facts of this case show such dealing with the property by appellants' cotenants as to enable them to claim against appellants the benefit of the statute of limitations. These questions need no further discussion.

It is clear that plaintiffs have an interest in the land through Mrs. Burnham, and that the only matter in the way of their right to recover is the statute of limitations of five years. The trial court assumed that the testimony indisputably showed that plaintiffs were barred by said statute. This is the subject of appellants' first assignment of error.

[5] Wm. E. Parker appears to have lived on this league something over four years when he sold to Vanham. It was shown that after he sold he moved off, and the house and premises he had used were unoccupied until the fall of 1880, when Sam Grant and wife moved into the house. Thus up to the fall of 1880 the five years' statute under the recorded deed to Wm. E. Parker was without any effect. This being the testimony before the court, it would clearly have been improper for the instruction to have been based on any possession up to the fall of 1880.

On November 24, 1884, the Vanhams conveyed the league to August Kountze, the deed not being filed for record until January 11, 1886. Up to 1884, when the Vanhams sold, the testimony was not conclusive that they had it occupied continuously.

[6] It clearly appears that Kountze bought and held the title on behalf of the Texas Land & Cattle Company, and on June 21, 1890, he executed a deed of it to said company, which deed was not recorded until June 7, 1892. By reason of the fact, however, that the Texas Land & Cattle Company was the real owner, although the deed was to Kountze, he holding the title for its benefit, the said company was entitled under the record of that deed to prescribe by the five years' statute the same as if the deed had stood in the company's name. Thomson v. Wiseman, 98 Tex. 170, 82 S. W. 503; Kirby v. Hayden, 44 Tex. Civ. App. 207, 99 S. W. 746.

[7] The Texas Land & Cattle Company commenced in 1885, and finished in 1886, a fence inclosing a large body of land estimated by some as 20 miles square and more. Within the inclosure said company owned or controlled a large quantity of the lands, according to some of the evidence 185,000 acres of it. The Henry Parker league was inside of this inclosure. But inside of this inclosure there were others who claimed or controlled tracts or bodies of land and used the large inclosure for their stock, as well as the Texas Land & Cattle Company. It appears to be well settled that by such joint use of the inclosure by those within it, each exercising the right to do so by virtue of his claim to own or control particular tracts therein, is such adverse possession of the tracts owned or claimed by each as will satisfy the statute. Taliaferro v. Butler, 77 Tex. 578, 14 S. W. 191; Church v. Waggoner, 78 Tex. 203, 14 S. W. 581; Brown v. O'Brien, 11 Tex. Civ. App. 459, 33 S. W. 267; League v. Buena Ventura Stock Co., 2 Tex. Civ. App. 448, 21 S. W. 307. The size of such inclosure is not material. Harris v. Bryson, 34 Tex. Civ. App. 532, 80 S. W. 105.

The testimony showed, without dispute, that in 1885 or 1886 the large body of land above described was inclosed partly by fences which it constructed and partly by adjoining fences and natural barriers by the Texas Land & Cattle Company, and so far as we see from the briefs the land remained substantially inclosed from that time on as late as 1897, about which time the Texas Land & Cattle Company and Gifford, who was also in the pasture controlling a considerable quantity of land therein, quit the cattle business. During that time the Texas Land & Cattle Company used the pasture, thus inclosed, as a pasture for running their cattle, as did the others who were inside of it. There was testimony of inferior fences being erected in the meantime and not kept up, but the main inclosure was maintained.

It is claimed by appellants that there was testimony that the fences were not kept up. Appellant refers us to the testimony of W. D. Cornelius, H. Gainor, and Ernest Dowdy. Dowdy does not refer to the outside fences ever being down. Gainor's testimony on the subject refers evidently to inside fences. In one place he stated: "From the summer of 1888 to 1908 this pasture was open from the south line thereof to El Campo." This does not evidence that the south line was not

fenced; on the contrary, it indicates that it was, but that it was open country inside. Cornelius did state that the south line of the pasture, where it was made by the north line of the Pierce wire' fence, was down in 1901 or 1902. This was long after the necessary time had elapsed to perfect the statute of limitations, and was really after it was admitted that the Texas Land & Cattle Company had gone out of the cattle business and had ceased to use the said large pasture. They went out of the business about 1897, at which time the bar of the statute was complete as to all except two of the plaintiffs.

The possession that was begun by the Texas Land & Cattle Company upon the building of the fence which inclosed and formed the pasture in 1886 continued for more than five years. The record title of the survey in question was in Kountze, who held it for the said company, so that from 1886 on, the holding by said company was under a duly recorded deed; the deed to Kountze having been recorded on January 11, 1886. It was undisputed that the taxes were regularly paid. The fact that Kountze made a conveyance of the league to the company on June 21, 1890, which was not placed on record until June 7, 1892, makes no difference for the reason that the deed to Kountze, which was of record, was in reality the deed to the company.

[8] However, it appears that the plaintiffs Mrs. Legge and Herbert Farjeon were minor children, their mother having died in July, 1883, and, though the above facts and conditions would be sufficient to bar the other plaintiffs, they would not bar these children. Mrs. Legge became 21 years of age August 27, 1895, and married November 25, 1903, and Herbert came of age October 27, 1901. This action was not brought until October 15, 1908. In order to bar Mrs. Legge, the necessary adverse possession of this land must have existed after August 27, 1895, and continued a sufficient time. In order to bar the plaintiff Herbert, the adverse possession must have existed after October 27, 1901, and continued the requisite period.

[9] We have considered the testimony bearing on the matter of adverse possession of the league during such time as the statute of five years would run against Mrs. Legge and Herbert Farjeon. We observe that about 1895 the company built a fence inside of the general pasture which inclosed separately about 20,000 acres of land including the Parker league. There was, we think, sufficient evidence tending to show that this smaller pasture was kept up and used by tenants of the Texas Land & Cattle Company down to the time the oil field came in, and for a sufficient time after the statute of five years began to run against said two plaintiffs to bar them. But the evidence was not of such conclusive nature as to warrant an instruction against them. As to said two plaintiffs, we conclude the judgment should be reversed and the cause remanded.

It is conclusively shown that the appellee the Northern Irrigation Company is entitled to the 1,008 acres of the league claimed by it, by virtue of the five years' statute. Hence the judgment in its favor for that portion is affirmed.

[10, 11] As to the appellee the Rio Bravo Oil Company, which asks for an affirmance of the judgment in its favor, we think it would be improper to do so. Concerning its liability to plaintiffs with reference to oil taken from the land, we think the Texas Land & Cattle Company, having an unquestioned undivided interest in the league, had, by virtue of its undivided ownership in the land, the right to extract oil from the tract. In case oil was not found, it would have to bear the loss of its experiment and could not call on a nonparticipating cotenant for contribution. But where it found oil and marketed the same, the cotenant requiring it to account to him for his interest in the product, measured by his interest in the land, would be required to allow his proportion of the necessary cost of producing and marketing the product. Wolfe v. Childs, 42 Colo. 121, 94 Pac. 292, 126 Am. St. Rep. 152. This reasonable expense would include the cost of the machinery and appliances and other means necessary and proper to the production. In other words, all reasonable expenses incurred in the production and marketing would have to be deducted from the gross value, before a division of the proceeds between the cotenants. The result of the above is that the Texas Land & Cattle Company, or its lessees of the land, had the right to pay and to charge to the fund derived from the product the reasonable cost of what was necessary to be done in producing and marketing the oil. This being so, it, or its lessee, had the right to contract with the Rio Bravo Oil Company for a pumping plant and a pipe line for utilizing the oil and to pay for the same, either in money or in oil; and in a suit by other cotenants against the producing cotenant for its share of the value of the oil, the cost of the plant and pipe line to the extent that it is fair and reasonable should be allowed. And the Rio Bravo Oil Company would not be liable to plaintiffs for the oil it received for such necessary improvements, if it was a fair equivalent therefor. This does not present the case of a trespasser taking oil from another's land, in which a different rule would apply. O'Neil v. Sun Co., 123 S. W. 176; Bender v. Brooks, 127 S. W. 170. Under the above circumstances, we are of opinion that the Rio Bravo Oil Company would not be liable to plaintiffs for the oil it took at its reasonable value in payment for the plant and pipe line supplied by it.

[12] As to the defendants the Producers' Oil Company and Pay Streak Oil Company, we think it would be clearly improper to affirm the judgment in their behalf. They

claim as lessees and occupants of parts of the land and are proper defendants, and by their pleadings are defending against plaintiffs' claim of title to the land. An affirmance of the judgment as to them would eliminate them from the case.

[13] The expenses and appliances connected with nonproducing wells sunk on the land by defendants are not chargeable to plaintiffs, but should be borne by those who incurred them. With reference to the producing wells, what is allowed the working cotenant, when called to account by another cotenant, is all expenses necessarily incurred by him in good faith in producing and rendering the product available. 2 Snyder on Mines, § 1453. Plaintiffs, seeking to avail themselves of the fruits of the production, will, in equity, be required to share the expense in proportion to their interests.

It seems to us that the peculiar circumstances of a cotenancy in land upon which oil is discovered warrant one cotenant to proceed and utilize the oil, without the necessity of the other cotenants concurring. Oil is a fugitive substance and may be drained from the land by well on adjoining property. It must be promptly taken from the land for it to be secured to the owners. If a cotenant owning a small interest in the land had to give his consent before the others could move towards securing the oil, he could arbitrarily destroy the valuable quality of the land. He could, of course, have partition; but such property would not be susceptible of partition in kind, and it would seem to be equally impracticable, with justice to all, to make partition by sale, for the reason that it would be impossible to know the extent and value of the oil in the ground. In this case the plaintiffs own but an inferior interest in the land, which interest is by this opinion materially reduced. It has already been finally decided, for the purposes of this case, during its pendency, by the Court of Civil Appeals at Galveston, that plaintiffs' title is not sufficiently clear or probable as to warrant a receivership, and the same would appear as to their right to injunction.

Plaintiffs, if they owned an undivided interest in the land, had the right, as well as defendants, to go upon the land and extract the oil, and each would have been subject to accounting to the other for the net proceeds thereof, which means the value of the oil taken by each, less the necessary and reasonable cost of producing it. Each would be chargeable to the other for what could be denominated as waste. See Snyder on Mines, § 1440. This suit, so far as the oil is concerned, is for an accounting, which subjects plaintiffs to the rules of equity governing in such cases.

We reach these conclusions in disposing of this appeal:

1. That the judgment in favor of the Northern Irrigation Company should be affirmed.

2. That the judgment in favor of defendants should be affirmed as against all the plaintiffs except Mrs. Legge and Herbert Farjeon.

3. That the judgment should be reversed and the cause remanded as between the plaintiffs Mrs. Legge and Herbert Farjeon and all the defendants (except the Northern Irrigation Company).

Affirmed in part. Reversed and remanded in part.

### On Motion for Rehearing.

The second ground of appellee's motion is that we erred "in holding that the statute of limitations did not continue to run from 1879 until 1886, whereby the statute of five years began to run against the mother of said parties (Herbert Farjeon and Mrs. Emma Irene Legge), and that therefore they were barred by limitation prior to 1890." This statement is somewhat obscure, but appellees doubtless mean by it that as the mother (Mrs. Burnham) died a married woman in 1883, if the adverse possession began prior thereto, it would operate against her children, though minors, because successive disabilities could not be tacked.

What we held was simply that it was error to instruct a verdict against said Herbert Farjeon and Mrs. Legge, upon the ground that it was conclusively shown they were barred. The testimony does not clearly show that when their mother died, in 1883, there was being maintained the necessary adverse possession, nor that such possession uninterruptedly continued up to the time the Texas Land & Cattle Company constructed its inclosure in 1885 or 1886. If, on another trial, it should be found, upon sufficient testimony, that limitations had commenced to run before their mother's death, but for her disability of coverture, and the necessary adverse possession continued for the requisite time after her death, the right of said Herbert Farjeon and Mrs. Legge would be barred. As the testimony is in the record before us, an instructed verdict against them on that ground would have been error. With this qualification of the original opinion we overrule appellee's motion.

The motion of appellants, the coplaintiffs of Herbert Farjeon and Mrs. Legge, is, after due consideration, overruled.

The motion of the Rio Bravo Oil Company is also overruled. It is strenuously contended by the last-named party that it indisputably appears from the record that it is not liable to the Hardy Oil Company's cotenants, being merely a purchaser of oil under a contract with the Hardy Oil Company, without knowledge of any cotenancy, and that therefore the judgment as to it should be affirmed.

[14] It is not perceived how it can claim to occupy the attitude of an innocent pur-

chaser. We have already held, and so has the Galveston Court of Civil Appeals on the previous appeal in this case, and the contention of innocent purchaser on the part of defendants has been in effect abandoned, that the record title to this league charged all persons dealing with it with notice of plaintiff's title. The Rio Bravo Oil Company is in no better position in this respect than the Hardy Oil Company, or any other defendant. Therefore its claim of immunity must depend on the principle, announced in the main opinion, that the Hardy Oil Company, as a cotenant, had the right to explore for and market the oil produced on this land. Purchasers of oil from it would not, we think, ordinarily be liable to the Hardy Oil Company's cotenants. But the transactions may be such as to subject them to liability, and this would clearly be so if the transaction constituted a wasteful disposition of the cotenants' interest in the oil. For example, suppose the sale of the oil was on such terms as to amount to a sacrifice of it, the purchaser would, without doubt, be liable to the cotenants, to the extent that such transaction constituted waste.

The circumstances attending the connection of the Rio Bravo Oil Company with the product in this case are meagerly developed. Its contract with the Hardy Oil Company is substantially all we find. By it the Hardy Oil Company contracted to pay it for a pumping station and pipe line the actual cost thereof in oil at the rate of 30 cents a barrel, and that as soon as it was thus paid for the Hardy Oil Company was to sell to it all the fuel oil up to a certain amount for the period of three years from the date of the contract, June 10, 1908. It appears from the testimony that when this contract was made, or rather when the pipe line was completed, the average value of oil was from 45 to 50 cents per barrel.

[15] It would appear from the above: (1) That the pumping station and pipe line were paid for in oil at about half its value, and whether or not this transaction constituted an act of waste, under the circumstances and to what extent, was a question of fact. (2) That the Hardy Oil Company entered into a contract with the Rio Bravo Oil Company for the sale to it of oil, to continue for a number of years, which period extended beyond the time the Rio Bravo Oil Company was made a party defendant. While we think the Hardy Oil Company, as a cotenant of the property, could produce and market the oil in the usual way, and the purchasers ordinarily would not be liable to other cotenants, we think it could not bind its nonconsenting cotenants by a contract of this kind. The Rio Bravo Oil Company's liability to plaintiffs in respect to oil received or purchased by it from the Hardy Oil Company depends on the question whether or not its transactions with the latter company involved waste of the product, and it would be liable to plaintiffs equally with the Hardy Oil Company to the extent of what was improvident or wasteful.

For these reasons it would be improper for us to hold as a matter of law, upon this record, that the judgment in favor of the Rio Bravo Oil Company should be affirmed.

The motions are all overruled.