## COMMERCIAL STATE BANK v. BLACK-WELL et al.

### No. 2317.

Court of Civil Appeals of Texas. Beaumont.

May 19, 1933.

Francis I. Tucker, of Nacogdoches, and Harris & Harris, of Austin, for appellant.

Hodges & Greve, of Nacogdoches, for appellees.

COMBS, Justice.

On June 15, 1932, the record in this case was mailed by appellant's counsel to the clerk of this court and same was received by the clerk on June 16, 1932, as shown by his notation thereon. However, the clerk declined to file the record for the reason that judgment overruling the motion for new trial appearing in the transcript was dated April 15, 1932, and it, therefore, appeared that the record had reached our court sixty-two days after the motion for new trial was overruled. On June 20, 1932, appellant filed a motion requesting that we direct the clerk to file the record, and the motion was granted.

In its motion appellant represents that, while the judgment overruling its motion for new trial is dated April 15, 1932, that being the date it was pronounced by the trial court,

that in fact that judgment was not actually entered on the minutes until April 20, 1932. The motion is supported by affidavit of the clerk of the district court made June 17, 1932, to the effect that the order overruling the motion for new trial was handed to him April 15, 1932, and that it remained in his office and in his custody until the 20th day of April, 1932, when it was by him entered and spread upon the minutes. Attorneys for appellees filed motion to strike the record, insisting that it did not reach this court in time. This motion was taken with the case. They attached an affidavit from the district clerk dated June 20, 1932, in which he states that:

"Affiant's records show that the judgment overruling the motion for new trial was entered in the minutes of the district court of Nacogdoches County, Vol. X, pages 144 and 145 Apr. 15, 1932, as shown by motion docket dated as overruled.

"That affiant heretofore signed the paper prepared by the defendant's attorney without giving same careful consideration and did not know or notice the date used in said instrument."

The sixty days allowed by article 1839, R. S., as amended by Acts 1931, c. 66, § 1 (Vernon's Ann. Civ. St. art. 1839), for filing the record in the Court of Civil Appeals, dates from the time the order overruling the motion for new trial is entered on the minutes and not from the date it was pronounced. It was so held by the Dallas Court of Civil Appeals in the case of Hamilton Motor Co. v. Muckleroy, 46 S.W.(2d) 451, Judge Looney, in the opinion, citing a number of cases in support of the decision. We agree with this holding of the Dallas Court of Civil Appeals on that question.

The two affidavits of the clerk throw much doubt on the question of when the order overruling the motion for new trial was actually entered. His first one states positively that he entered it on April 20, 1932. If this, is correct, then the record reached this court fifty-seven days afterward and was within time. But in his second affidavit he says that "his records show" it was entered in the minutes April 15, 1932, "as shown by motion docket dated as overruled." He nowhere states that the order was actually entered on April 15th or that it was not entered on April 20th, as his first affidavit states that it was, nor does he state that he has no recollection of when it was entered. This being the state of the record, it is our duty to resolve any doubt in favor of our jurisdiction. Hamilton Motor Co. v. Muckleroy, supra. The motion to strike is overruled.

On Motion to Strike Statement of Facts.

Appellee seasonably filed a motion to strike out the statement of facts on the ground of alleged failure of appellant to comply with the provisions of article 2238, R. S. 1925, as amended by Acts of the Forty-Second Legislature (1931), First Called Session, p. 75, c. 34, § 2 (Vernon's Ann. Civ. St. art. 2238). Appellees' main contention is that notice of the filing of the court reporter's transcript of the evidence with the district clerk was not served upon them or their counsel.

The statement of facts is in proper form, certified to by the court reporter, and approved by the trial judge. It is signed by attorneys for appellant, but appellees' attorneys did not sign it. Instead they signed the following statement: "The statement of facts tendered us, consisting of 99 pages, June 13, 1932, and without waiving any rights and decline to examine it to determine whether we can approve it, until the provisions of the statute have been followed."

It thus appears that the statement of facts was tendered to counsel for appellees for their examination and approval and that they declined to examine it. It is not contended that the statement of facts is incomplete or inaccurate. We recently had before us a similar question in the case of Texas & N. O. R. Co. v. Davis, 60 S.W.(2d) 505. Here, as in that case, we decline to strike out the statement of facts on the showing made. The motion is overruled.

On the Merits.

This appeal is from the judgment of the district court of Nacogdoches county, Tex., awarding to appellees, who were plaintiffs in the court below, the title and possession of three tracts of land, aggregating 545.56 acres, and canceling two deeds of trust in favor of appellant, Commercial State Bank, and a trustee's deed made by virtue of the deeds of trust, conveying a one-half interest in said lands to the bank. Appellee R. H. Blackwell is the father of the other appellees, who are his children by his first wife, Robbie Blanch Blackwell. For convenience, we will hereinafter refer to the children as appellees Buelah Blackwell et al. and to the appellant as the bank.

On April 14, 1925, plaintiff R. H. Blackwell executed a deed of trust in favor of the bank to secure an indebtedness of $10,535.39, which represented money previously borrowed by him from the bank from time to time. The deed of trust covered several tracts of land in Nacogdoches county, aggregating 1,344 acres, less a 200-acre homestead on the Chiréno grant, and included the three tracts involved in this suit. The note was renewed from time to time until January 25, 1929, when R. H. Blackwell executed a new deed of trust covering the same land, except that no homestead reservation was made; R. H. Blackwell having moved to Nacog-

doches in the meantime. At the time the second deed of trust was executed, the indebtedness had increased to $11,037.37. In 1931, the indebtedness being unpaid, the bank caused Jewel Byrd, substitute trustee, to advertise the land for sale in accordance with the terms of the deed of trust, except that a one-half undivided interest only in the three tracts in controversy was advertised for sale; the bank conceding, as it does here, the title of the appellees Buelah Blackwell et al., to the extent of a one-half interest as heirs of their mother, Robbie Blanch Blackwell, deceased. The bank bought in the land, crediting the purchase price on the indebtedness, and took a deed from the trustee June 3, 1931. Thereafter this suit was instituted by the appellees in the nature of trespass to try title and seeking a cancellation of the two deeds of trust above mentioned and of the trustee's deed, in so far as they relate to the land in controversy. Plaintiffs Buelah Blackwell et al. allege in their petition, as a ground for cancellation of the deeds of trust and trustee's deed conveying the land to the bank that the three tracts of land in controversy were the separate property of their mother, Robbie Blanch Blackwell, who died in 1913 intestate; that they inherited the land from her; that the deeds of trust in question were not given to pay community debts; and that the bank took the deeds of trust and the deed with full knowledge, actual and constructive, of such facts, and is not an innocent purchaser for value. The bank answered by general demurrer, several special exceptions, general denial, and plea of not guilty, and by special pleas in which it denied the allegations of plaintiffs to the effect that it was not an innocent purchaser and pleaded affirmatively that it acquired the property in good faith for value and without notice, actual or constructive, that the land was the separate property of Robbie Blanch Blackwell, if in fact it was her separate property.

The trial was to a jury, and at the conclusion of the evidence the trial court instructed a verdict in favor of plaintiffs. Judgment was thereafter entered awarding to appellees Buelah Blackwell et al. title and possession of the land and canceling the deed of trust and the trustee's deed so far as they relate to the land in controversy. The judgment recites that said plaintiffs are "all the surviving children of R. H. Blackwell and their mother Robbie Blanch Blackwell, deceased, who the court finds paid with her separate funds the purchase price for the three tracts of land and of which fact the defendant bank had notice prior to the execution of either of the deeds of trust."

Thus the court finds, as a basis for the judgment, that the land in controversy was paid for by Robbie Blanch Blackwell with her separate funds, and further that the bank had notice of such fact prior to the execution of either of the deeds of trust. On the record before us both were issues of fact, which required jury findings, and the court was in error in instructing a verdict.

■■ On the issue of the land in controversy being the separate property of Robbie Blanch Blackwell, the plaintiff R. H. Blackwell testified that he married Robbie Blanch Blackwell, his first wife, September 15, 1889, and that she died December 28, 1913. The first tract in controversy is 330 acres in the M. C. Chireno grant. This was acquired by warranty deed from Susan H. Patton to Robert H. Blackwell, dated September 5, 1891, for a recited consideration of $2,200, "paid by Robert H. Blackwell." The second tract is 97.56 acres in the M. C. Chireno and Creed S. Ingledow surveys. This was acquired by warranty deed from Jane A. V. Gillikin and husband to R. H. Blackwell, dated September 26, 1908, for a recited consideration of $248.65 cash "paid by R. H. Blackwell." The third tract is 118 acres. This was acquired by deed from Eugene Burroughs and wife to R. H. Blackwell, dated October 31, 1911, for a recited consideration of $1,500 cash. R. H. Blackwell testified that his wife, Robbie Blanch Blackwell, paid for all three tracts with her separate funds. In that connection he stated the source from which she obtained the money used in paying for each tract; he testifying that some of it came from the estate of her father, some from the sale of lands in Smith county which she had inherited, and some from the estate of M. L. Patton. Thus it would appear from R. H. Blackwell's testimony that all three tracts of land in controversy were the separate property of his first wife and that he merely held the legal title as trustee for her. However, there is nothing in the deeds by which the land was acquired nor in the records of Nacogdoches county, so far as disclosed by the evidence, to indicate such fact, and; the presumption obtains that the land was community property of R. H. Blackwell and Robbie Blanch Blackwell. R. H. Blackwell is the only witness who testified on this issue. The bank offered considerable evidence tending to impeach his testimony. Thus a deed from R. H. Blackwell to T. M. Hooks, dated September 16, 1919, conveying the pine timber on the land in controversy and warranting the title was introduced, as was also a deed from Blackwell to Hooks dated the 13th day of May, 1920, conveying certain hardwood on the same land. The bank also introduced an affidavit made by R. H. Blackwell the 11th day of October, 1920, in which he stated that he was the owner of the tract of land acquired from the M. L. Patton estate on the Chireno grant, that he had used the same, paid taxes on it, and had open and continuous possession of it, and that "I know of

566

no adverse claim to the same." A similar affidavit as to his ownership and possession of the other two tracts involved in this suit was made on the same day.

■ It is settled law of this jurisdiction that the uncorroborated testimony of an interested party, even though it be uncontroverted, can do no more than raise an issue for the jury. Stone v. City of Wylie (Tex. Com. App.) 34 S.W.(2d) 842; Sovereign Camp v. Jackson (Tex. Civ. App.) 138 S. W. 1137; Hobart National Bank v. Fordtran (Tex. Civ. App.) 122 S. W. 413; Wyatt v. Moore (Tex. Civ. App.) 152 S. W. 1133.. It is apparent that the rule applies with all the more force in this case in view of the impeaching evidence, some of which we have referred to above.

Whether the bank is an innocent purchaser of the land was, on the record before us, an issue of fact, and should have been submitted to the jury. In view of another trial, we will discuss this matter.

■ As we have already stated, there was nothing of record which had the effect of giving constructive notice to the bank that the plaintiffs Buelah Blackwell et al. were the equitable owners of all of the land in controversy; the presumption arising from the recorded instruments being that the land was community property of their father, R. H. Blackwell, and their mother, Robbie Blanch Blackwell, in which they owned a one-half interest only. But appellees contend that the bank had actual notice of appellees' claim and could not be an innocent purchaser. Of course, if the bank had actual notice, which includes the knowledge of all those facts which a reasonable inquiry would have disclosed, the duty of inquiry extending to those matters only which are fairly suggested by the facts really known, it could not be an innocent purchaser. For, as stated in Tex. Jur. vol. 9, p. 108, "one is charged as having actual notice of those things which under the circumstances he ought to have ascertained, whether he did so or not."

■ The plaintiff, R. H. Blackwell, testified in regard to the matter of giving notice to the bank, as follows: "The first man mentioned to me about giving the deed of trust was Hal Tucker, it was in the spring of 1925. * * * I was passing along by the bank, he was in front of the bank, he commenced talking to me and asked me to come in. Went in and went over to a corner of the bank and he said the bank examiner was cutting up about my note and some of the bank officials wanted him to approach me, and I said that I have about 640 acres of land that nobody has any claim on, and he said 'All right, I will tell Eugene Blount about it and he will talk to you about it', and sometime that day I went in the bank and Eugene Blount came to me and said that 'you are willing to give a deed of trust', and I said 'Yes, I have some land the children own, but I have about 640 acres that nobody has any claim on.' He asked me where my homestead was, and I said that I lived in Nacogdoches until June and went out on the farm and stayed until September. He said he knew my note was all right and he didn't give a damn for a deed of trust but he wanted to satisfy the bank examiner, and he had my field notes and he was going to make it include everything but my homestead. I told him that my children owned a portion of it but he said he was going to make it include the whole thing except my homestead just to make it look good to the bank examiner. He told me he would have the deed of trust written and for me to drop in in a day or two and sign it. These conversations were about the same time the deed of trust was given."

The deed of trust given in 1925 described several tracts of land, aggregating 1,344 acres, and contained the recital, "less my homestead of 200 acres which is situated on the Chireno grant." When the deed of trust was renewed by Blackwell January 25, 1929, the homestead exemption was eliminated from the description, but said deed of trust contained the following recital: "This applies to my interest in the above described property only." Blackwell testified that he had the notary insert this recital before he would execute the deed of trust. Blackwell also testified with regard to the land in controversy that "it was all enclosed by a fence and has been for about fifteen years, a part of it for maybe fifty years. * * * It has been cultivated by different tenants." He further stated: "I collect the rent." He further testified that the same condition existed in April, 1925, when the first deed of trust was given and in January, 1929, when the second deed of trust was given. Blackwell also testified that the deed of trust was given to secure an old debt, and that he did not borrow any money from the bank the day he executed it, and that none of the debt was incurred during the lifetime of his first wife. He further testified that: "It was Mr. Blount who gave a reason for including all the land in the deed of trust was to satisfy the bank examiner. Mr. Blount said the bank examiner was eating him up about my note and to satisfy him he wanted to include all this land. I told him that my children had an interest in a portion of it."

The record shows that Eugene Blount was at that time president of the bank, and that he died some four years before the trial. Hal Tucker, active vice president of the bank, denied that Blackwell told him about the children's interest. He testified further that at the time the first deed of trust was taken R. H. Blackwell furnished the bank an abstract of title, that the bank had it examined

by their attorney, and was furnished a legal opinion to the effect that the title was in Robt. H. Blackwell, except the community interest in the children. T. E. Baker, president of the bank, testified that Blackwell never at any time intimated to him that the three tracts of land involved in this suit were the separate property of his wife, and further stated: "I have understood all the time that it was community property of himself and his first wife." He further testified that Mr. Tucker and himself acted as appraisers in the guardianship of some of the plaintiffs, who were then minors, and R. H. Blackwell was their guardian, and that Mr. Blackwell at that time told Tucker and himself, as appraisers of the estate, that the land in controversy in this suit was community property. The record shows that the appraisement referred to was made in 1920. The evidence shows that officers of the bank were well acquainted with R. H. Blackwell for a number of years before the bank took the first deed of trust. They knew that his first wife was dead and that he had children by that marriage.

It is apparent that the evidence above summarized presents two conflicting theories on the question of notice. According to the evidence offered by appellees, the jury might have found, had the issue been submitted, that the bank knew that the three tracts of land were the separate property of Robbie Blanch Blackwell and that they owned all of the title as her heirs, or, if it did not know such fact, that it was in possession of facts which put it upon inquiry, and that, had it made such investigation as an ordinarily prudent person would have made under the same or similar circumstances, it would have learned such fact prior to the time it accepted the first deed of trust. On the other hand, if the jury had accepted as true the evidence offered by the bank, they might have found that it did not know of such fact and that a reasonably prudent person, situated as it was, would have been satisfied upon the facts known to it, and its attorney's opinion on the abstract and statements made to its officers by R. H. Blackwell, that it was getting a valid lien on a community half interest of R. H. Blackwell in said land when it accepted the deed of trust.

■ The bank was not deprived of its defense of innocent purchaser by reason of the fact that the deed of trust was given by R. H. Blackwell to secure a pre-existing debt. The evidence shows that the bank extended the time of payment when it took the first deed of trust in 1925, and that it extended the time of payment a number of times thereafter. It is the well-settled law of this state that an extension of time of payment constitutes a valid consideration which affords a mortgagee protection against unknown prior equities of third parties. This is so because in making the contract he has yielded up the valuable right to demand immediate payment of the debt due him. Brooks v. Asherton State Bank (Tex. Civ. App.) 278 S. W. 473, 474; Steffian v. Bank, 69 Tex. 513, 6 S. W. 823; Adkins-Polk Co. v. Rhodes (Tex. Com. App.) 24 S.W.(2d) 351, 355. This court, in an opinion by Chief Justice Walker, makes a similar holding in the case of Lone Star Finance Corp. v. Fulbright, 61 S.W.(2d) 562, this day decided.

■ Appellees insist that, when the bank accepted the second deed of trust in 1929, it released the lien secured in 1925, and cite Adkins-Polk Co. v. Rhodes, supra, in support of their contention. The case cited is authority for the proposition that the taking of the second deed of trust had the effect of releasing any lien which the bank obtained on the land in controversy as a good-faith taker of the first lien, provided it knew at the time it took the second deed of trust that appellees Buelah Blackwell et al. were the equitable owners of the land. But there is no evidence in the record that the bank knew any more about the matter in 1929, when it took the second deed of trust, than it did in 1925, when it took the first one, unless the recital in the second deed of trust, "this applies to my interest in the above described property only," had the effect of bringing such notice home to the bank. It cannot be said, as a matter of law, that such was the effect of the recital. If the bank's evidence be accepted as true, the jury would be warranted in concluding that a reasonably prudent person would have interpreted this recital as referring to the fact that R. H. Blackwell was claiming only a community half interest in the three tracts of land involved in this suit. The recital is but an evidentiary circumstance or fact, to be considered by the jury in determining the issue of notice.

■ Nor is the fact that R. H. Blackwell was in possession of the land at the time the deed of trust was given such as to deprive the bank of its defense of innocent purchaser, as a matter of law. The possession, at most, could have done no more than put the bank on inquiry of R. H. Blackwell as to the nature of his claim. According to appellee's testimony, he did tell the bank that the land belonged to his children. According to the bank's testimony, he told the bank it was community property. In either case, the bank would have learned no more by inquiring of Blackwell than it already knew.

For the errors discussed, the case is remanded for a new trial.