## GULF PRODUCTION CO. v. KISHI et al.

### No. 2506.

Court of Civil Appeals of Texas. Beaumont.

June 7, 1934.

Rehearing Denied May 26, 1937.

David Proctor and O. S. Parker, both of Houston, and V. H. Stark and W. E. Lea, both of Orange, for appellant.

E. L. Reid and K. W. Stephenson, both of Orange, for appellees.

WALKER, Chief Justice.

On the 23d day of December, 1919, K. Kishi and Isaac Lang leased to the Gulf Production Company a tract of about 160 acres of land, out of the southeast corner of the Jas. Dyson league in Orange county, excepting therefrom a small tract of 25 acres out of the extreme southeast corner

of the 160 acres. The following quotation is from this lease:

"First. For the right herein granted, to-wit: said Company pays to the Lessors, the sum of Two Thousand· ($2,000.00) Dollars, (to said K. Kishi $1,500.00) and to said Isaac Lang $500.00 cash with the signing and delivery of this instrument, the receipt of which is acknowledged, and further obligates and binds itself, its successors and assigns, that it will within Ninety (90) days from the date hereof in good faith commence operations in the drilling of a well for oil on said premises and will continue such operations in good faith continuously until said well has been finally completed, going to such depth as the experience in this locality indicates as necessary to discover oil and make a producing well.

"Second. If oil in paying quantities should not be found in the first well sunk on said premises, then the Company shall have the right within Sixty (60) days from the completion of said first well to commence and complete in a like manner a second well on said premises, and this right shall continue to additional wells, as long as said Company may desire, it commencing one of such additional wells at all times within 60 days after the completion of the preceding well, and this lease shall remain in force during all such operations. Failure to commence said second or additional wells within said 60 days shall automatically operate as a forfeiture of this lease.

"Third. If oil shall be found on said premises in paying quantities, then unless lessee shall within 60 days from such finding of oil in paying quantities, begin the drilling of another well and unless lessee shall thereafter continue to drill other wells (beginning each additional well within 60 days from the completion of the last prior well), until a total of 12 wells, shall have been drilled on said premises, this lease shall on such failure at any time cease to be effective except as to, and the lessee shall on such failure lose its rights hereunder, except as to an area equal to five (5) acres, for each producing well, which total area may be selected by lessee, both as to location and shape, and as to which this lease and lessee's rights hereunder, shall remain effective so long as production or explorations are continued by lessee on such retained area in accordance with the other terms of this lease; Lessee having expressly the right to drill as many additional wells, as it pleases on such retained area. It is expressly stated that such alternative right to drill 12 wells or to forfeit the lease with the exception of the retained area at any time during the drilling of such 12 wells, is at lessee's election."

This lease was referred to in the lower court as "Kishi-Lang 'A' Lease." On the 12th day of March, A. D. 1920, the same lessors leased to the same lessee the 25 acres excepted from the "A" lease, except 5 acres off the west end of the 25 acres. This lease was referred to in the lower court as "Kishi-Lang 'B' Lease." The following quotation is from the "B" lease:

"If no well or shaft is commenced on the premises on or before the 12th day of March, A. D. 1921, this lease shall terminate as to both parties, unless lessee on or before said date shall pay or tender to lessors, in the manner hereinafter provided, the sum of Two Thousand ($2000.00) dollars, which payment or tender shall operate as a renewal to cover the privilege of deferring the commencement of a well, or shaft, for twelve months (12) from said date. But in the absence of drilling or mining operations, this lease cannot be kept in force by such payments or tender for a longer total period than two (2) years from the date of this lease, and if lessee shall fail to make any such payments or tender when due, this lease shall terminate and both parties be released from all obligations hereunder.

"Fifth. Lessor agrees that the cash payment or bonus received by him for this lease, and the other obligations of lessee to offset as expressed in the next succeeding paragraph, constitutes a valid and sufficient consideration to support each and every right and privilege conferred on the lessee by this instrument, including the option to the lessee to extend this lease from time to time, within the limitations and upon the terms hereinbefore stated. But, except as stated in the next succeeding paragraph hereof, the lessee shall not be obligated against its will to drill or otherwise conduct operations hereunder.

"Sixth. If during the existence of this lease there shall be drilled on adjacent land within 200 feet of any line of the premises, a well producing daily as much as 200 barrels of oil for 30 consecutive days, the lessee will, with reasonable diligence, begin and prosecute the drilling of

an offset well on the leased premises, and will under like conditions offset all other oilwells drilled on adjacent land. Likewise, lessee agrees with reasonable diligence to offset all paying gas wells drilled within 200 feet of any line of the premises and from which the gas is marketed, provided the lessee may, at its option, pay the lessor the royalty herein specified for wells producing gas only, in lieu of drilling such offset gas well or wells."

"Fourteenth. Should oil in paying quantities be found on the leased premises, then additional wells shall be drilled thereon until as many as four producing wells are drilled and such additional wells shall be drilled within not more than 90 days interval between the completion or abandonment of one and commencement of work on another and a failure to drill such additional wells shall terminate this lease as to all land except 5 acres in a square around each producing well, with the well in the center."

On January 20, 1931, K. Kishi instituted this suit against Gulf Production Company, alleging that under the two leases Gulf Production Company assumed a covenant, implied by law, to use reasonable diligence to develop adequately the leased premises for oil, and that it breached this duty, thereby causing him to suffer the damages sued for. By his second amended original petition, Kishi, in addition to the original defendant, made the following parties defendant: W. D. Gordon, Geo. E. Holland, E. L. Reid, and the independent executors of the will and estate of Isaac Lang, deceased, to wit: Gilbert Lang, Sylvan Lang, and Mrs. Henrietta Lang, alleging that they claimed an interest in the leased premises. All the new defendants, except the independent executors, without objection by any one, were subsequently eliminated from the case. On January 1, 1931, the Lang executors filed their original answer, pleading a specific interest in the leased premises, and, as ground of recovery against Gulf Production Company, adopted the allegations of the plaintiff K. Kishi. Trial was had on Kishi's fifth amended original petition and the fourth amended original answer and cross-action of the Lang executors, which, in substance, adopted the allegations of the Kishi petition. Gulf Production Company answered by general and special exceptions, general denial, and several special pleas. Under the pleadings and the evidence a strip of 10⅔

acres off the south side of the two leases was released from the controversy. As to the remainder of the leased premises the following issues were submitted to the jury and answered as indicated:

"Question Number One. From a preponderance of the evidence do you believe that the defendant Gulf Production Company failed to use reasonable diligence to develop the leased premises described in plaintiff's petition as the 'A' Lease for the production of oil from June 1, 1927, to July 31, 1931?" Answer: "Yes."

"Question Number Two. From a preponderance of the evidence, how much oil, if any, do you find that the defendant Gulf Production Company could have produced, through the use of reasonable diligence, from June 1, 1927, to July 31, 1931, from the 'A' Lease described in plaintiff's petition (excepting therefrom that portion thereof included in the 10-2/3 acre tract operated jointly by Humble Oil & Refining Company and Gulf Production Company)." Answer: "950,000 barrels oil."

"Question Number Three. From a preponderance of the evidence, do you believe that defendant Gulf Production Company failed to use reasonable diligence to develop the leased premises described in plaintiff's petition as the 'B' Lease for the production of oil from June 1, 1927, to July 31, 1931?" Answer: "Yes."

"Question Number Four. From a preponderance of the evidence, how much oil, if any, do you find that the defendant Gulf Production Company could have produced, through the use of reasonable diligence, from June 1, 1927, to July 31, 1931, from the 'B' Lease described in plaintiff's petition (excepting therefrom that portion thereof included in the 10-2/3 acre tract operated jointly by Humble Oil & Refining Company and Gulf Production Company)." Answer: "$450,000 barrels oil."

"Question Number Five. From a preponderance of the evidence, what do you find was the average market value of oil produced in the Orange Oil Field from June 1, 1927, to July 31, 1931"? Answer: "$1.13 per barrel."

On the verdict judgment was entered on the 15th of February, 1933, against Gulf Production Company, in favor of K. Kishi, for $143,607.30, and in favor of the Lang executors for $47,869.10.

The general demurrer of appellant Gulf Production Company, against the pleadings

of appellees K. Kishi and the Lang executors, should have been sustained. Appellees pleaded in hæc verba leases A and B upon which they base their cause of action. They pleaded further that the Gulf Production Company completed its first well on the A lease on or about May 2, 1921, and that thereafter, prior to January 20, 1927, it drilled to completion fifteen wells on the A lease, exclusive of that part of the A lease covered by the 10⅔-acre strip. They pleaded further that the Gulf Production Company completed its first well on the B lease on or about the 5th day of October, 1920, and that thereafter, prior to January 1, 1927, it drilled to completion six wells on the B lease, exclusive of five wells drilled on that portion of this lease within the 10⅔-acre strip. No point was made in the pleadings that these wells were not drilled successively within the time stipulated in the leases; in fact, appellees' cause of action, as reflected by the special issues, was for the negligence and default of appellant subsequent to June 1, 1927. It is thus made to appear by appellees' affirmative allegations that appellant faithfully performed all the express covenants assumed by it under the two leases, for the development of the leased premises for the discovery and production of oil. The theory of negligence submitted to the jury was under the implied covenant, pleaded by appellees, to do such work of development "to produce or attempt to produce oil * * * as would have been reasonably certain to have paid the Gulf Production Company a reasonable profit," quoting from special charge No. 1, given to the jury at their request.

Under its general demurrer appellant contends that the very language of the leases necessarily excluded the implied obligation for development pleaded by appellees and submitted to and found in their favor by the jury.

It is the theory of appellees that the leases in issue are to be construed by the following proposition announced by Judge Greenwood, speaking for the Supreme Court, in Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.(2d) 27, 29: "Fourth. Where a mining lease provided for oil or gas royalties, and failed to define the lessee's duty as regards development after discovery of paying oil or gas, the law implied the obligation from the lessee to continue the development and production of oil or gas with reasonable diligence. Benavides v. Hunt, 79 Tex. [383] 396, 15 S.W. 396; Grubb v. McAfee, 109 Tex. [527] 530, 531, 212 S.W. 464; T. P. Coal & Oil Co. v. Barker [117 Tex. 418] 6 S.W.(2d) [1031] 1035, 1036 [60 A.L.R. 936]; Freeport Sulphur Co. v. American Sulphur Royalty Co. [117 Tex. 439] 6 S. W.(2d) [1039] 1042, 1043 [60 A.L.R. 890]." And when so construed that appellant rested under an implied covenant to drill wells in the development of the leased premises in excess of the agreed number. In their brief appellees state the point at issue as follows: "This case involves merely the construction of the leases to determine whether or not the parties have agreed as to what should constitute a reasonable development of the premises." And in connection with this proposition they concede that where the parties agree as to what shall constitute reasonable development, "no implied covenants for development will be indulged." This concession by appellees clearly states the law that must govern the construction of the leases. In Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W. (2d) 1039, 1041, 1043, 60 A.L.R. 890, it was said:

"It is elementary that an express stipulation upon a matter excludes the possibility of an implication upon the same subject. * * *

" 'Implied covenants can only be justified upon the ground of legal necessity. Such a necessity may arise out of the terms of the contract or out of the substance thereof. One absolutely necessary to the operation of the contract and the effectuation of its purpose is necessarily implied whether inferable from any particular words or not. It is not enough to say it is necessary to make the contract fair, or that it ought to have contained a stipulation which is not found in it, or that, without such covenant, it would be improvident or unwise or would operate unjustly; for men have the right to make such contracts. Accordingly courts hesitate to read into contracts anything by way of implication, and never do it except upon grounds of obvious necessity.' "

In 10 Texas Jurisprudence, p. 320, it is said: "If one's duties and obligations under a contract are clearly expressed, there is nothing left to implication; all implications which would otherwise arise are superseded by the express agreement. If the thing impliedly to be done is of un-

certain nature, an express agreement in reference to the same will exclude an implied covenant to do something else, though subsequent events may show that such other thing is reasonable. Nothing may be implied which is negatived by or contrary to the express provisions of the contract; and where the meaning is plain, another meaning may not be added by implication or intendment."

Again, in the same paragraph just quoted from, it is said of contractual implications or covenants: "They are justified only on the ground of necessity, and may be resorted to only for the purpose of arriving at and enforcing the true intent of the parties."

On this issue, in Grubb v. McAfee, 109 Tex. 527, 212 S.W. 464, 465, our Supreme Court said:

"It is to be noted that the written contract expressly required nothing of defendant in error save to begin a well within 30 days and to continue to drill it until oil was found in paying quantities or until a depth of 300 feet was reached. And the Court of Civil Appeals determined that the law required no more of defendant in error, in order to acquire a vested right in the land for 20 years. To uphold that construction of the contract would require us to assume that the owner of the land intended to grant such a vested right, not only without benefit to himself, but even to his positive detriment. The consideration for this contract to the owner consisted alone in royalties on the minerals to be produced during the term of the contract, unless we can reasonably assume that it would benefit him to have his land proven as containing valuable oil deposits, though no oil was produced therefrom for a term like 20 years. No assumption of that sort can be reasonably indulged. It would ignore the very nature of oil and gas, which were the minerals first mentioned in the contract. For the natural result of stopping the production of oil or gas from the tract on which it was discovered in paying quantities for such a period of time would be to invite its drainage from adjacent tracts, to say nothing of the danger of the oil's migration.

"It is because of such considerations that the rule has become settled that— 'Even in the absence of an express covenant, when a lessee undertakes to develop oil or gas land on a rental or royalty basis, *and* the contract *does not specify the num-* *ber* of wells to be drilled, there is an implied obligation that he will fully develop the land with reasonable diligence.' 18 R. C.L. § 114. The Supreme Court of Iowa declares that all the authorities unite in this holding. Price v. Black, 126 Iowa [304] 306, 101 N.W. 1056. See, also, 27 Cyc. 728; Black on Rescission and Cancellation, § 471; Brewster v. Lanyon Zinc Co., 72 C.C.A. 213, 140 F. 801; Note, 20 Ann.Cas. 1167, 1168." (Italics ours.)

The authorities cited fully support the proposition that implied covenants can arise only where the language of the contract fails to express fully the duties, rights, and obligations of the contracting parties; and only such covenants can be applied as are necessary to effectuate the intent of the parties. The following brief summary of the material provisions of the leases quoted above states the express covenants assumed by appellant for the development of the leased premises for oil: Section 1 of the "A" lease obligated appellant to commence in good faith "the drilling of a well for oil on said premises" within 90 days from the date of the lease and in good faith to prosecute the work to completion. If oil in paying quantities was not found in the first well, the second section obligated appellant to begin a second well within 60 days from the completion of the first well and to continue development until oil was discovered. Paragraph 3 is a clear stipulation of the diligence owed by appellant under this lease after the discovery of oil and of the extent of the diligence to be exercised by it in subsequent development for oil. Under this paragraph, if oil was found on the leased premises in paying quantities, then within 60 days "from such finding of oil in paying quantities" appellant was to begin the drilling of another well and to continue drilling other wells, beginning each additional well within 60 days "from the completion of the last prior well" until a total of twelve wells had been drilled. It thus appears that the contract clearly provided for the discovery well and for the drilling of eleven wells in addition thereto, after the discovery of oil in paying quantities. Section 14 of lease "B" was equally clear in its intendments, and left nothing for implication. If oil was discovered on the leased premises, section 14 explicitly provided that "additional wells shall be drilled thereon until as many as four producing wells are drilled and such additional wells shall be drilled within not more than 90 days intervals

between the completion or abandonment of one and the commencement of work on another." As we construe these express covenants, they provided how and when the search for oil should be made; thus, they clearly defined appellant's duty, as lessee, in searching for oil until the completion of the discovery well and then provided in exact terms the number of wells to be drilled after the completion of the discovery well. The following authorities support appellant's contention, made in support of its general demurrer, that the language of the leases in issue constituted a clear statement of its duties and that in writing these leases the parties left nothing to implication:

In Waggoner Estate v. Sigler Oil Co., supra, the lease in issue contained the following material provision: "Annual rental provided for herein, to-wit, $100,000 per year, payable annually in advance, on the 27th day of each January, during the life of said lease to be placed at the First National Bank, Fort Worth, Tex.; provided each producing well shall hold 2,000 acres in a square, said well to be the center, and said 2,000 acres shall be released as to further annual rental." The lease contained no provision whatever for development after the discovery of oil. For the reason that this lease failed to define lessee's duty as regarded development after the discovery of oil in paying quantities, the Supreme Court held that the law implied an obligation on the part of lessee to continue development and production of oil or gas with reasonable diligence after bringing in the discovery well.

In Leonard v. Prater (Tex.Com.App.) 36 S.W.(2d) 216, 217, 86 A.L.R. 499, the lessee agreed to drill one well on the west 112 acres of the 200-acre tract covered by the lease, and, "within 90 days, after bringing in said first well, commence the drilling of a well on the east 88 acres of said 200 acres." The Commission of Appeals treated the two wells mentioned in the lease merely as exploratory or test wells, and, on the theory that no provision was made after the discovery of oil for subsequent development, read into the lease an implied obligation to exercise reasonable diligence in subsequent development.

The lease in Freeport Sulphur Company v. American Sulphur Royalty Co., supra, contained the following provisions: "VII. As a further consideration for this contract and the performance thereof by said Simms, said Swenson & Sons agreed that they, their heirs, executors, administrators, or assigns, shall within one (1) year from June 1, 1912, erect or cause to be erected and put in operation upon the land mentioned and described in aforesaid Exhibit A a complete plant consisting of one unit in accordance with the process operated at the Union Sulphur Works in Louisiana, under the expired Frasch patent. Such plant shall be located on aforesaid land at such place as said Swenson & Sons, or their heirs, executors, administrators, or assigns, may think best and most expedient." The lessee complied strictly with its duty as there expressed. The lessor contended that the lessee rested under an implied obligation to develop the property beyond this express provision. Holding that the express stipulation excluded the possibility of an implied obligation for further development, the Supreme Court said:

"We have concluded that no implied covenant exists for the full and general development of the property, as contended for by the royalty company, for the reason that the provision in paragraph VII for the erection of a one-unit plant was an express provision for development, and negatives an implication for development. * * *

"The language is clear that the sulphur company should erect on the property a complete plant of one unit and put it in operation in accordance with the process used in the Union Sulphur Works in Louisiana. * * *

"The parties having contracted for development, an implied covenant exists for diligent operation for the best advantage and benefit of both."

The lease in Becker v. Submarine Oil Co., 55 Cal.App. 698, 204 P. 245, 246, by the District Court of Appeal of California, contained the following provision: "It is further agreed that the party of the second part shall complete three wells within 90 days from the date hereof and 10 wells within one year, and the failure on the part of the party of the second part to comply with any of the terms of this agreement or an abandonment of work for 60 days shall, at the option of the first party, work a forfeiture of this lease and the parties of the first and third parts may upon a 30 days' written notice re-enter said premises and remove all persons therefrom." Holding that this lease was not subject to the construction of an implied

.. 

740

covenant, the court said: "This lease under consideration by us made definite provision for the development work which the lessee is required by its terms to do. The parties left nothing to implication. To remove all doubt in that regard, they have also made a clear stipulation concerning the conditions under which there may be a forfeiture of the lease. Where it appears, as it does here, that the parties considered the matter of forfeiture and agreed as to what acts or omissions on the part of the lessee should give the lessor the right to claim a forfeiture, and where it further appears that their minds have met upon the character and amount of the drilling for oil that the lessee must do, it would be usurping the right of the parties to contract for the court to insert other requirements and provisions concerning these important considerations."

In Stoddard v. Emery, 128 Pa. 436, 18 A. 339, by the Supreme Court of Pennsylvania, the lease in issue provided "for the drilling of one oil-well in eight months, and a second [well in the future] at a time not specified." Construing that lease, the court said: "The proposition that there was an implied covenant to bore wells every four months, or as often as it was customary to put down additional wells in the absence of any express contract, is altogether untenable. The parties provided by the express terms of their contract how many wells should be put down, and that provision of the contract determines the question. When the number is expressed, there is no room for any implication that there should be some other number. Had there been nothing said in the contract on the subject, there would of course have arisen an implication that the property should be developed reasonably, and evidence of a custom of reasonable development by boring a given number of wells in a certain space of time would have been competent, and perhaps controlling. But that doctrine has no application in a case when the parties have expressly agreed in the contract how many wells shall be bored."

In Skinner v. Ajax Portland Cement Co., 109 Kan. 72, 197 P. 875, 876, by the Supreme Court of Kansas the court said: "It is competent for the parties, however, to make such a contract as they see fit, and if the subject is covered by express stipulation there is no occasion or opportunity to supply agreements by inference. 'When a lease provides how and when search for oil or gas shall be made, there is no room for implications.'"

In Mills v. Hartz, 77 Kan. 218, 94 P. 142, 144, by the Supreme Court of Kansas, it was said: "When a lease provides how and when search for oil or gas shall be made, there is no room for implications."

O'Neil v. Sun Company, 58 Tex.Civ.App. 167, 123 S.W. 172, 173, was by the San Antonio Court of Civil Appeals, writ of error refused. The lease in that case provided as follows:

"First. Said second party hereby agrees to commence with the drilling of a well on said tract of land within ten days from this date and to complete the same with due diligence to such depth as is commonly recognized as the oil-producing depth in the vicinity of this tract of land, unavoidable accidents, and delays excepted.

"Second. On the completion of said first well, if the same is a paying well, the second party agrees to commence the drilling of a second well on said acre of land within ten days after the completion and putting to pumping of said first well, and on the completion of said second well, if the same is a paying well, said second party agrees to commence with the drilling of a third well within ten days after the completion and putting to pumping of said second well."

Holding that these express stipulations excluded the possibility of an implied obligation for additional development, the court said:

"In the first place, the purpose of this contract was not the general development of the acre for oil production. The Sun Company entered into no such undertaking. It was expressly provided that only in the event of the first well being a paying well was the company obligated to sink a second well. If the first yielded oil in paying quantities, then within 10 days thereafter the company was to begin a second one, and, if the second one proved a paying one, then within 10 days it was to begin a third one. It was optional with the company whereabouts on the leased land it would sink those wells. The said provisions were inserted for the benefit of the company, and excluded any such idea as that it would be required to drill at places to be designated by O'Neil, or that it would in any event be required to bore more than three wells, or, if any of

the wells bored proved a failure, that it would be obligated to bore any further. There is nothing in the contract which can be construed to have the effect of imposing the duty upon the lessee to sink a well or wells at a particular place or places, or to sink same with reference to what was advisable, or with reference to the lessor's wishes, or with reference to the protection of lines of this tract from depletion by contiguous wells. The undisputed evidence shows that the Sun Company in due time began a well at the southeast corner of the tract, which resulted in a total failure, at great cost to the company. Under the plain terms of the contract, no further obligation was imposed upon it to bore another well. There can be no doubt, however, that under this contract the company had the right to sink further wells, as many as it wanted to, upon the acre, or any unreleased portion of the acre, during the term of one year. This is by force of its performance of the expressed consideration. Its right to thus exploit this land according to its own discretion became vested by the terms of the contract when the consideration was performed."

██ It follows that the trial court erred in overruling appellant's general demurrer.

By its brief appellant makes the following additional points against the judgment of the lower court: (a) The issues submitted to the jury were not raised by the evidence; (b) the court erred in receiving certain testimony in evidence; (c) under the evidence, it appeared conclusively that appellee Kishi owned no right, title, or interest in the cause of action pleaded by him and that he had no right to prosecute it to judgment; (d) that the verdict of the jury was so against the great weight and preponderance of the testimony as to be clearly wrong. Points (a), (b), and (c) present propositions of law over which the Supreme Court has jurisdiction without a statement by us from the record; point (d), because material only in the event point (a), is overruled. Since the judgment of the lower court must be reversed and judgment here rendered in favor of appellant, we pretermit a discussion of the additional points of error.

We pretermit a discussion of all exceptions urged by appellees against appellant's assignments of error and propositions. The overruling of the general demurrer, which was properly briefed, constituted fundamental error and, therefore, the assignments against the other propositions become immaterial.

██ Appellees insist that counsel for appellant, on oral argument, abandoned all assignments and propositions except the one we have discussed above. Appellant controverts this contention and insists that nothing said by its counsel on oral argument should be given by us that construction. The court does not have a very clear recollection of what happened in this connection. However, we believe counsel, in oral argument, should be at liberty to answer freely questions of law asked by the judges and should an answer be given inadvertently they should not be bound thereby. The contention that the additional assignments were abandoned is overruled.

██ Article 1848, R.S.1925, as amended in 1931 (Vernon's Ann.Civ.St. art. 1848), provides that cases "shall be set for submission eight weeks ahead of the date of submission" and that appellant shall have 30 days from date of the notice of the setting of his case in which to file his briefs. On the 29th day of June, 1933, this case was set for submission for the 14th day of December. On October 11th, at a time when appellees had filed no briefs and before appellant had filed its brief, appellees filed their motion to dismiss this appeal for want of prosecution on the ground that appellant had not filed its brief within the time allowed it by article 1848; that is to say, it had not filed its brief within 30 days after receiving notice of the setting of its case for the 14th day of December. By an interlocutory order we overruled this motion. After appellant filed its brief on the 16th of November, appellees moved to strike on the ground that the briefs were filed too late. This motion was also overruled by an interlocutory order. It is our conclusion that appellees' rights under their motion should be determined as of the date of their filing and that they should not be estopped by reason of the fact that, after their motions were overruled, they proceeded in due order to file their briefs. It is our further conclusion that the motions were properly overruled. The controlling factor of article 1848, as amended in 1931, is the provision that cases should be set *"eight weeks ahead of submission"*; so, since appellant filed its brief within the first 30 days of the eight weeks immediately preceding the date of submission, we think the intent

of the statute has been complied with. Though this is the first time we have filed .a written opinion construing this article, as amended, we have uniformly given it this ·construction.

 On the 13th of July, after the ·statement of facts was filed on the 14th of June, appellees filed their motion to strike it from. the record on the following grounds:

(a) Three volumes of the statement of facts, for the most part, consist of printed forms of documents received in evidence. Instead of copying this documentary evidence into the statement of facts, the stenographer included in his statement of facts printed forms, being exact copies of the documentary evidence and certified to by the court as such. We think this action by the stenographer was a substantial compliance with the following provisions of article 2239, R.C.S.1925, as amended in 1931 (Vernon's Ann.Civ.St. art. 2239): "Any original documentary evidence, sketches, maps, plats or other matters introduced in evidence shall be transcribed by such stenographer into the said' stenographer's report;"

(b) The inclusion in the statement of facts· of documentary evidence excluded by the trial court does not constitute a basis for striking the statement of facts. It· is merely our duty to disregard that portion of the statement of facts in determining the merits of the appeal. Boggess v. Harris, 90 Tex. 476, 39 S.W. 565.

(c) The Lang appellees moved to strike the statement of facts on the ground that they had no notice of its original filing in the district court' and had no opportunity to examine it before its final approval by the trial' court. The certificate of the trial judge to the statement of facts was as follows:

"This statement of facts, including bills of exception shown therein, has been duly filed and notice given to all parties and is' approved and ordered filed as a part of the record in this cause, this the 14th day of June, 1933.

"F. P. Adams, Judge Presiding."

If we have jurisdiction to receive evidence in impeachment of this certificate, appellant's controverting affidavit is clearly to the effect that the Langs had actual knowledge of the original filing of the statement of facts at the time when it was filed and that they stated that an 'examination would be made by counsel for Kishi and approved by such counsel; in corroboration of this affidavit appellant has filed therewith a letter from the trial judge, certifying to the correctness of the facts thus verified. The facts support the certificate of the judge.

(d) Appellees make the further point that the original filing of the statement of facts on the 5th of June was not in compliance with the provisions of article 2238, R.S.1925, as amended in 1931 (Vernon's Ann.Civ.St. art. 2238), and that the trial judge "was without authority" to make the order of June 14, 1933, approving' it. The point seems to be that appellees were not served with the notice provided by this. article. The authorities construing this article on this point were reviewed by Judge Looney, speaking for the Dallas Court of Civil Appeals, in Garrison v. Great Southern Life Ins. Co., 69 S.W.(2d) 218, and a most material conflict noted. If we have jurisdiction to receive testimony on this issue, we think the trial court's certificate has full support by appellant's controverting affidavit by its attorney Hon. O. S. Parker, which was to the effect that after its original filing, the 'statement of facts was delivered to counsel for Kishi, with knowledge of the attorney for the Langs, and with the statement by him that Kishi's attorney would examine and approve it, and that it was, in fact, examined by Kishi's attorney and no suggestions made as to any change therein. These facts constituted a substantial compliance with article 2238, as construed by this court in Texas & New Orleans R. Co. v. Davis, 60 S.W.(2d) 505; Texas & New Orleans Ry. Co. v. Adams, 60 S.W.(2d) 509; Commercial State Bank v. Blackwell, 61 S.W.(2d) 563.

On July 13, 1933, appellees also filed their motion to strike the transcript on the ground that the certificate of the clerk thereto was fatally defective. Immediately after this motion was filed, appellant filed its motion for certiorari to perfect the record by correcting the certificate to the transcript and "by adding to said transcript, as now on file, such other matters, if any there be, to make said transcript complete in showing all proceedings had in this cause in the trial court and for such other relief as may be necessary to perfect said record in this court." The certiorari was granted, as prayed for; counsel for appellant took the writ of certiorari from the

clerk and the transcript from our files, with the permission of our clerk, and delivered them to the clerk of the district court of Orange county, with instructions to execute the writ of certiorari. The clerk undertook to execute the writ in the following manner: He tore it apart, took out his original certificate and the original cost bill, and inserted in the transcript certain other papers, a new cost bill, a new certificate, reassembled the transcript, put his seal thereon, and delivered it back to counsel for appellant. After the transcript was refiled in our court, appellees renewed their motion to strike, making the point that the method pursued by the clerk in the execution of the writ of certiorari constituted a mutilation of the transcript and destroyed its original filing and that it could be considered a filed paper only from the date of its second filing.

It seems to be the law that where an appellant, without permission of the court, takes out the transcript and mutilates it by adding new material thereto, the original filing is destroyed and the transcript can be considered as filed only from the date when refiled. Clark v. Thompson, 42 Tex. 128; Peak v. Lynch, 43 Tex. 276. But the Court of Civil Appeals has the power to authorize the appellant to withdraw the transcript for the purpose of correcting the defective certificate of the clerk of the trial court. Radford Grocery Co. v. Owens (Tex.Civ.App.) 159 S.W. 453; Gutheridge v. Gutheridge (Tex.Civ.App.) 159 S.W. 452. Under these authorities, where the correction is made under authority of a writ of certiorari, the original filing is not impaired.

Appellees have filed an affidavit by the clerk of the district court of Orange county fully supporting their theory of mutilation, but appellant's counsel, Hon. O. S. Parker, has filed a controverting affidavit to the effect that when he delivered the transcript to the clerk he merely instructed him to execute the writ of certiorari; that he gave him no instructions to tear apart the original transcript, nor to remove any paper therefrom, nor to add any paper thereto. As no suspicion of want of good faith is raised against Mr. Parker in making his affidavit, we think the conflict should be resolved in support of his theory of the facts. On this conclusion, appellant has not mutilated the transcript and is not chargeable with the conduct of the district clerk in tearing the transcript apart,

etc. The motion to strike the transcript is, therefore, overruled.

The judgment of the lower court is reversed and judgment here rendered in favor of appellant, that appellees recover nothing against it, and that it go hence without day and recover its costs.

Reversed and rendered.